**UNITED STATES of America**
v.
**Willie BELL, Appellant (two cases).**
**Nos. 72–1518, 72–2209.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 11, 1973.

Decided Nov. 1, 1974.

Leonard I. Rosenberg, Washington, D. C., for appellant.

Stuart M. Gerson, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., at the time the brief was filed, John A. Terry, Asst. U. S. Atty., and Herbert B. Hoffman, Asst. U. S. Atty., at the time the brief was filed, were on the brief, for appellee. Harold E. Reukauf, Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and ROBINSON, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

A jury found Willie Bell guilty of two federal narcotic offenses[1] and, additionally, of carrying a pistol without a license.[2] On these appeals, one from the judgment of conviction[3] and the other from denial of a motion for a new trial,[4] Bell argues a number of grounds for reversal.[5] In this opinion we consider, in varying detail, each of his contentions, and for reasons articulated we affirm.

## I. THE FACTUAL BACKGROUND

We begin with a recital of the highlights of the Government's evidence at Bell's trial. Bell and two others, Willie Cardwell and Freddie Davis, were suspected of trafficking in narcotics.[6] In a

---

1. 21 U.S.C. § 174 (1964) and 26 U.S.C. § 4704(a) (1964), both repealed, 84 Stat. 1291, 1292 (1970). The repealing legislation saves the operation of each section as to prosecutions for violations occurring, as here, prior to the effective date of the repeal. 84 Stat. 1294 (1970).

2. D.C.Code § 22–3204 (1973).

3. This appeal is No. 72–1518.

4. This appeal is No. 72–2209.

5. For the narcotic offenses, Bell was sentenced to imprisonment for forty months to ten years on the § 4704(a) count, and to a concurrent term of imprisonment for twenty years and the payment of a $20,000 fine on the § 174 count. On the pistol-carrying count, a consecutive sentence of imprisonment for one year was imposed. Bell was found not guilty on a charge of possessing marijuana in violation of D.C.Code § 33–402(a) (1973).

6. Previously, when Officer Miller and other policemen had another location under surveillance, Cardwell and Davis were observed in a parked car exchanging manila packets for money. After watching their activities for some time, the officers arrested them and seized a quantity of drugs. Bell was seen leaving the area shortly before the arrests were made.

Later, Officer Miller was informed that the drug-peddling operation had been moved to Fisherman's Wharf. The officer testified that on numerous occasions he observed Bell, Cardwell and Davis on the wharf exchanging tinfoil packets for money. See note 61, *infra*.

coordinated effort to execute a search warrant on them, a group of plainclothes police officers undertook a stakeout of Fisherman's Wharf, on the Washington Channel in Southwest Washington. Officer Charles A. Miller, who previously had monitored the suspects' activities at the wharf and elsewhere,[7] functioned as coordinator for the group; from East Potomac Park, directly across the Channel, he kept the wharf under observation through binoculars. Three officers patrolled the Channel in a boat just offshore, while three others were stationed in a position overlooking the wharf area. Communicating by radio, the officers awaited the suspected arrival of the three subjects.

Cardwell and Davis came first, and went on Pier 1 with fishing tackle and paper bags. Shortly thereafter, they were seen exchanging a tinfoil packet for money handed to them by an unidentified man. Bell, also carrying a bag, made his appearance on the pier somewhat later. As soon as Officer Miller sighted all three men, he alerted his fellow officers, joined them at the wharf, and led them onto Pier 1.

As Officer Miller announced his identity, Bell and his companions endeavored to dispose of the contents of the bags. Bell tossed four tinfoil packets over his shoulder into the Channel. Davis kicked into the water another bag of packets, and Cardwell threw overboard still another bag from which more tinfoil packets spilled. By this time, however, the officers cruising the Channel had moved in, and with Officer Miller pointing out the floating bags and packets,[8] they retrieved them with a net. Two more packets were found on the pier in a barrel beside which Bell was standing.

The three subjects were placed under arrest and searched. Bell was carrying a loaded pistol, over $1,500 in cash and an envelope containing marijuana.[9] In each of the six tinfoil packets attributed to Bell was a powder containing heroin, and in four of them the heroin content was unusually high.[10] None of the packets bore federal tax stamps,[11] nor did Bell have a permit to carry the pistol.[12] In due course, Bell, Cardwell and Davis were jointly indicted; the latter two pleaded guilty, but Bell stood on his plea of not guilty and went to trial.

That, in the main, was the Government's case.[13] Bell's defense was that at no time did he possess any of the packets. He testified that he went to the wharf with a friend[14] to purchase fish, stopping first at the stands to browse and then to chat with Cardwell and Davis on the pier. As he was making his way back to the front of the pier, Bell said, he was met by the onrushing policemen who yelled "freeze," and he immediately obeyed the order. Bell stated that the money he had was to be used in

---

7. See note 6, *supra*.

8. The packets Bell tossed into the water floated about fifteen feet from Davis' bag, about six to eight feet from the bag thrown by Caldwell, and about four or five feet from the boat occupied by the officers.

9. Cardwell had $634 grouped in packets of $75 each, and Davis, like Bell, was carrying a pistol.

10. The four packets which Bell tossed into the Washington Channel contained 50,485 milligrams of a powder 71.6% heroin by volume. There was testimony at trial that samples of comparable size with a higher heroin content are "very rare," and that the four seized from Bell had a street value of $13,000 to $14,000 when prepared for sale. The two packets recovered from the barrel beside which Bell was standing yielded 15,435 milligrams of a powder containing both heroin and quinine, the amount of heroin being 6.0.

11. See 26 U.S.C. § 4704(a) (1964).

12. See D.C.Code § 22–3204 (1973).

13. We relate other facets of the Government's evidence in subsequent parts of this opinion.

14. Roland Holiday, a fellow fisherman and long-time friend, testified that he accompanied Bell to the wharf to buy fish. Upon their arrival, Holiday said, he went to the men's room, and when he emerged the officers' roundup was in progress. He stated that he did not see Bell throw anything into the Channel.

a business venture,[15] and avowed that he had nothing to do with the narcotics trade.

The jury accepted, for the most part, the Government's evidence and convicted.[16] Following return of the verdict, the trial judge heard argument on Bell's in-trial motion, on which the ruling had been reserved, for dismissal of two counts of the indictment. The motion was based on the Government's refusal to reveal the identity of an informant who participated in a transaction which the Government used to rebut testimony by Bell that he was unfamiliar with narcotics.[17] In a written opinion, the judge denied the motion.[18] Shortly thereafter, Bell engaged new counsel who moved for a new trial on several additional grounds.[19] The judge held an evidentiary hearing on that motion and, in another opinion, denied it also.[20] The case was then brought here for review.

## II. BELL'S IMPEACHMENT

Bell was the first witness for the defense. Questioned on cross-examination as to whether Cardwell and Davis were selling drugs on Fisherman's Wharf just prior to their arrest, Bell testified that he had never seen narcotics except on television.[21] In rebuttal, the Government recalled its star witness, Officer Miller, to recount a drug sale allegedly made by Bell a few days prior to his arrest. According to Officer Miller, on that occasion he and another officer completely strip-searched an informant to make certain that he had no drugs on his person, and provided him with police funds to undertake a purchase from Bell. Officer Miller then took the informant to the wharf and, keeping him in sight at all times, watched him buy a "halfspoon" of a substance which, as indicated by a field test, contained a narcotic drug of the opiate group.

On cross-examination of Officer Miller, Bell's counsel sought the name of the informant. The trial judge overruled the Government's objection to that effort, but Officer Miller could recall only that the informant's nickname was "Bo-Bo." The officer stated that he could furnish the informant's surname on the next court day.

When trial resumed, however, the Government announced that it would not identify the informant further. The trial judge expressed the feeling that disclosure of the informant's full name might be in the interest of a fair trial, but after hearing argument he decided to hold his ruling in abeyance pending return of the jury's verdict.

After the jury found Bell guilty, counsel filed briefs and presented oral argument on a motion to dismiss the narcotic counts because of the Government's re-

---

15. The enterprise consisted in the purchase and resale of clothing. In this Bell was corroborated by Almon Burke, his partner in the venture.

16. The jury did, however, acquit Bell on a charge of possession of marijuana. See note 1, *supra.*

17. We discuss this aspect of the case in Part II, *infra.*

18. United States v. Bell, 341 F.Supp. 275 (D.D.C.1972).

19. We discuss these grounds in Part III, *infra.*

20. United States v. Bell, Cr. No. 2128-70 (D.D.C. Nov. 2, 1972) (unreported). We reproduce this opinion as appendix hereto and cite it, as repaginated, "App. 37."

21. The colloquy between the prosecutor and Bell was as follows:

Q. Now, what happened when you were talking to Mr. Cardwell and Mr. Davis? What were they doing?

A. Fishing and clowning around.

Q. Were they selling any narcotics down there?

A. I have never seen any of them.

Q. Have you ever seen narcotics before?

A. Not, I would say, actually close right down—right to look at it. I have seen it on television and I have heard it described.

Q. And, this trial is the first time where you have got a chance to see real live narcotics, isn't it?

A. I haven't seen it in the trial. I have just seen it from a distance. I couldn't verify it was narcotics. That is only what they told me.

fusal to name the informant. The trial judge found the Government's argument persuasive, and in a written opinion ruled that the Government need not make the disclosure.[22]

■ Bell's complaint with respect to Officer Miller's rebuttal testimony is twofold. Firstly, he asserts that it was error to allow the officer to say anything about an alleged drug transaction which was not charged in the indictment on trial.[23] Secondly, he argues that the trial judge's refusal to require the Government to specify the identity of the informant utilized in that transaction was likewise erroneous. We consider, and reject, each of these contentions in turn.

### A. *The Mode of Impeachment*

■■ The first prong of Bell's attack on the rebuttal testimony advances the familiar principle that evidence indicating an accused's complicity in another crime is normally to be excluded[24] in the interest of avoiding the possibility that the verdict on guilt or innocence will be influenced thereby.[25] This rule is, however, subject to exception in situations wherein the evidence serves "some substantial, legitimate purpose,"[26] and an attempt to impeach the accused as a witness may be just such a purpose.[27] But, as we have sternly admonished, "[a]n inexorable requirement, obtaining as to all evidence unveiling another offense, is that its probative virtues must outweigh its prejudicial proclivities."[28] The initial question which Bell raises is whether the incident to which Officer Miller testified met that requirement.[29]

On his direct examination, Bell said in effect that his only activity with Cardwell and Davis on Pier 1 shortly prior to

22. United States v. Bell, *supra* note 18, 341 F.Supp. at 276.

23. The Government notes that there was no objection to Officer Miller's rebuttal testimony aside from the demand for revelation of the informant's identity. We think the Government's point is not well taken. Prior to the Government's proffer of the rebuttal testimony, the trial judge had ruled, over defense counsel's protest, that the Government could show Bell's involvement in drug transactions on Fisherman's Wharf prior to the date of his arrest. See note 61, *infra*. That categorical ruling obviated the need for further objection to additional evidence of that type. *E.g.*, Evalt v. United States, 359 F.2d 534, 542 (9th Cir. 1966).

24. *E. g.*, Freeman v. United States, 116 U.S. App.D.C. 213, 214, 322 F.2d 426, 427 (1963); Hansford v. United States, 112 U. S.App.D.C. 359, 365, 303 F.2d 219, 225 (1962); Harper v. United States, 99 U.S. App.D.C. 324, 325, 239 F.2d 945, 946 (1956); Fairbanks v. United States, 96 U.S.App.D.C. 345, 347, 226 F.2d 251, 253 (1955).

25. Harper v. United States, *supra* note 24, 99 U.S.App.D.C. at 325, 239 F.2d at 946; Witters v. United States, 70 App.D.C. 316, 318, 106 F.2d 837, 839 (1939); United States v. Smith, 283 F.2d 760, 763 (2d Cir.), cert. denied, 365 U.S. 851, 81 S.Ct. 815, 5 L.Ed.2d 815 (1960); Dranow v. United States, 307 F.2d 545, 566 (8th Cir. 1962).

26. Drew v. United States, 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964) (footnote omitted).

27. See, *e. g.*, Walder v. United States, 347 U. S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954); Gordon v. United States, 127 U.S.App.D.C. 343, 383 F.2d 936 (1967), cert. denied, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968); Luck v. United States, 121 U.S. App.D.C. 151, 348 F.2d 763 (1965).

28. Bradley v. United States, 140 U.S.App.D. C. 7, 13, 433 F.2d 1113, 1119 (1969). See also United States v. Marcey, 142 U.S.App. D.C. 253, 256, 440 F.2d 281, 284 (1971); United States v. Bussey, 139 U.S.App.D.C. 268, 271, 432 F.2d 1330, 1333 (1970); Drew v. United States, *supra* note 26, 118 U.S. App.D.C. at 15–16, 331 F.2d at 89–90; Harper v. United States, *supra* note 25, 99 U.S. App.D.C. at 325, 239 F.2d at 946. Compare Luck v. United States, *supra* note 27, 121 U.S.App.D.C. at 156–157, 348 F.2d at 768–769.

29. This inquiry in no way involves D.C.Code § 14–305 (1973), which governs witness-impeachment by proof of conviction of crime. The impeachment in this case did not utilize that technique; rather, it sought to contradict an item of Bell's testimony. The distinction between these two modes of impeachment is, of course, well settled. See, *e.g.*, 3A J. Wigmore, Evidence §§ 977–988, 1000–1015 (Chadbourn rev. 1970). In thus pointing up the issue here, we intimate no view as to whether § 14–305 could in any event apply to this case.

arrest was conversation. Asked on cross-examination whether they "were selling any narcotics down there," Bell answered that he had "never seen any of them."[30] Two further questions by the prosecuting attorney brought out that Bell intended that answer to convey precisely what it had seemed to say—that Bell had never seen real narcotics.[31]

We are unable to distinguish this testimonial episode from one before the Supreme Court in Walder v. United States.[32] There the accused, indicted similarly to Bell,[33] "[o]f his own accord . . . went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics."[34] The Court upheld impeachment of that claim by rebuttal testimony revealing the accused's possession on another occasion of a one-grain capsule of heroin.[35] So important to the accused's credibility was that testimony that the Court approved its admission

although, unlike anything in the case at bar, the Government had come by the capsule in the course of an illegal search.[36]

We think the same result follows here. We have been advertent to our obligation to apply *Walder* within its prescribed limits, which encompass the use even of tainted evidence to impeach exhorbitant testimonial claims volunteered by an accused on trial.[37] Surely our obligation is not diminished by the circumstances that the evidence here is untainted, or by any notation that *Walder* was insensitive to the competition of probative value and potential prejudice.[38]

In the instant case, Bell represented himself not only as an industrious businessman on Pier 1 merely to buy fish and chat with friends, but also as one who had never seen narcotics except on television, and consequently one who did not traffic in them. Evidence tending to show that Bell had previously transacted a sale of narcotics obviously bore a

30. See note 21, *supra*.

31. See note 21, *supra*.

32. *Supra* note 27.

33. As described by the Supreme Court, "for purchasing and possessing one grain of heroin." Walder v. United States, *supra* note 27, 347 U.S. at 62, 74 S.Ct. at 355.

34. *Id.* at 65, 74 S.Ct. at 356.

35. *Id.* at 64–66, 74 S.Ct. 354. Compare United States v. Fench, 152 U.S.App.D.C. 325, 330–332, 470 F.2d 1234, 1240–1242 (1972), cert. denied, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973), where other-crimes evidence was admitted on rebuttal as substantive evidence in refutation of testimonial claims by the accused.

36. Walder v. United States, *supra* note 27, 347 U.S. at 64–66, 74 S.Ct. 354. The Court elaborated:

Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious tes-

timony in reliance on the Government's disability to challenge his credibility.

*Id.* at 65, 74 S.Ct. at 356. (footnote omitted) See also Harris v. New York, 401 U.S. 222, 224–225, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) ; *id.* at 226–228, 91 S.Ct. 643 (dissenting opinion).

37. See Blair v. United States, 130 U.S.App. D.C. 322, 326–327, 401 F.2d 387, 391–392 (1968) ; Inge v. United States, 123 U.S. App.D.C. 6, 11, 356 F.2d 345, 350 (1966) ; White v. United States, 121 U.S.App.D.C. 287, 349 F.2d 965 (1965) ; Johnson v. United States, 120 U.S.App.D.C. 69, 344 F.2d 163 (1964) ; Bailey v. United States, 117 U.S. App.D.C. 241, 242–243, 328 F.2d 542, 543–544, cert. denied 377 U.S. 972, 84 S.Ct. 1655, 12 L.Ed.2d 741 (1964) ; Tate v. United States, 109 U.S.App.D.C. 13, 14–16, 283 F.2d 377, 378–380 (1960).

38. In *Walder*, the Court cited and quoted from Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), with approval. In *Michelson*, the Court had admonished that "[w]ide discretion is accompanied by heavy responsibility on trial courts to protect the practice" of impeaching character witnesses "from any misuse." 335 U. S. at 480, 69 S.Ct. at 221. See also Awkard v. United States, 122 U.S.App.D.C. 165, 167–168, 352 F.2d 641, 643–644 (1965) ; Shimon v. United States, 122 U.S.App.D.C. 152, 156–157, 352 F.2d 449, 453–454 (1965).

high degree of relevance to his credibility in disclaiming any acquaintance with narcotics. And since Bell's defense to the charges on trial was largely self asserted,[39] the jury's need to accurately assess Bell's credibility was vital.[40] Officer Miller's rebuttal testimony went no further than the necessities of meeting Bell's self-volunteered declaration of unfamiliarity with narcotics,[41] and promised more than enough of a contribution to the cause of truth to outweigh the attendant risks.[42]

**B. *Nondisclosure of the Informant's Identity***

█ In this court, as in the District Court, the Government asserts its privilege to keep nameless as well as faceless those who supply it with information on crime.[43] The essence of the privilege is nondisclosure of the informant's identity,[44] a prerogative conferred in "furtherance and protection of the public interest in effective law enforcement."[45] However, "[t]he scope of the privilege is limited by its underlying pur-

39. See text *supra* at notes 13–15.

40. See, *e.g.*, Brooke v. United States, 128 U.S.App.D.C. 19, 25, 385 F.2d 279, 285 (1967).

41. Compare United States v. Bussey, *supra*, note 28, 139 U.S.App.D.C. 272–273, 432 F.2d at 1334–1335.

42. During the course of his general charge to the jury, the trial judge instructed that any consideration of Officer Miller's rebuttal testimony was to be confined to assessment of Bell's credibility as a witness. See note 59, *infra*. No such instruction was requested or given during rendition of that testimony, see *e.g.*, United States v. McClain, 142 U.S.App.D.C. 213, 217–218, 440 F.2d 241, 245–246 (1971); United States v. Wright, 160 U.S.App.D.C. 57, 63, 489 F.2d 1181, 1187 (1973), apparently because Officer Miller recalled as the last trial witness, was excused only a short time prior to counsel's closing arguments and the judge's charge. Since no question in that regard is raised on appeal, we have no occasion to consider the matter further. See cases cited *infra* note 61. We note in passing that a suitable limiting instruction was included in the general charge, see United States v. Henson, 159 U.S.App.D.C. 32, 39–40 n.6, 486 F.2d 1292, 1299–1300 n.6 (*en banc* 1973); United States v. Fench, *supra* note 35, 152 U.S.App.D.C. at 332, 470 F.2d at 1241; that the charge followed closely on the heels of Officer Miller's tenure as a witness, see *id.*; and that the impeaching event to which the officer testified did not differ significantly from other drug-related transactions already admitted in evidence without limitation, and not complained of here, see notes 61–62, *supra*, and accompanying text.

43. The parties share common ground in accepting the incident to which Officer Miller testified was one appropriate for invocation of the privilege although, of course, they debate the question whether the privilege could prevail over Bell's demand for the informant's name. Officer Miller's testimony related, however, not to a divulgence of information, but to a drug sale to the informant wholly within the officer's view. Compare Roviaro v. United States, 353 U.S. 53, 58, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), where, in such a situation, the Government did not see fit to defend an application of the privilege. On the other hand, it is not unusual for informants to cooperate physically as well as informationally in criminal investigations, see cases cited *infra*, and the reason underlying the privilege of nondisclosure hardly distinguishes the two kinds of activities. See text *supra* at note 45. Nor have the courts made any such distinction. See cases cited *infra*. Moreover, in the case at bar, an affidavit on behalf of the Government avowed that the informant maintained a valuable informing role in ongoing drug investigations which disclosure of his identity would destroy. See text *infra* following note 82. That, we believe, all the more brought the privilege into play.

44. "What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Roviaro v. United States, *supra* note 43, 353 U.S. at 59, 77 S.Ct. at 627.

45. *Id.* "The privilege recognizes the obligation of citizens to communicate their knowledge of commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.* See also Branzburg v. Hayes, 408 U.S. 665, 698, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); McCray v. Illinois, 386 U.S. 300, 309–311, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); Westinghouse Elec. Corp. v. City of Burlington, 122 U.S.App.D.C. 65, 71, 351 F.2d 762, 768 (1965).

pose," [46] and one such limitation "arises from the fundamental requirements of fairness." [47]

Here, as in Roviaro v. United States,[48] the seminal case, the question was "the Government's right to withhold the identity of an informer who helped to set up the commission of the crime and who was present at its occurrence." [49] In *Roviaro*, the Court rejected a flat rule "that the identity of such an informer must be disclosed whenever the informer's testimony may be relevant and helpful to the accused's defense." [50] "We believe that no fixed rule with respect to disclosure is justifiable," [51] said the Court; rather, "[t]he problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." [52] And

> [w]hether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the in-

former's testimony, and other relevant factors.[53]

The task which the trial judge faced in this case was to ascertain, by an investigation of that character, whether the balance favored the public or the individual interest advanced here.[54]

It was upon just that type of investigation that the judge ruled that the informant's identity need not be revealed.[55] He began by culling out the circumstances deemed pertinent to the inquiry, and he then appraised them in terms of the balance to be made.[56] His conclusion that the privilege should prevail was drawn, not from any one particular, but only after "considering the array of factors outlined" in his written opinion [57] "and the overwhelming nature of the proof." [58] Our review of the judge's ruling in light of the trial record gives us no cause to upset his evaluation.

■ As the judge readily recognized, not only did Officer Miller's testimony go directly to Bell's credibility as a witness but also, despite limiting in-

46. Roviaro v. United States, *supra* note 43, 353 U.S. at 60, 77 S.Ct. at 627.

47. *Id.*

48. *Supra* note 43.

49. Roviaro v. United States, *supra* note 43, 353 U.S. at 61, 77 S.Ct. at 628.

50. *Id.* at 61–62, 77 S.Ct. at 628. See also McCray v. Illinois, *supra* note 45, 386 U.S. at 311, 87 S.Ct. 1056. Decisions prior to *Roviaro* had considered the informant privilege absolute in character. *E. g.*, Vogel v. Gruaz, 110 U.S. 311, 315–316, 4 S.Ct. 12, 28 L.Ed. 158 (1884) ; Arnstein v. United States, 54 App.D.C. 199, 203–204, 296 F. 946, 950–951, cert. denied, 264 U.S. 595, 44 S.Ct. 454, 68 L.Ed. 867 (1924). We have long since realized that *Roviaro* abandoned that concept and struck "a new balance between the need of litigants for information possessed by the Government and the need of the Government to foster the flow of information provided to it." Westinghouse Elec. Corp. v. City of Burlington, *supra* note 45, 122 U.S.App.D.C. at 70–71, 72, 351 F.2d at 767–768, 769.

51. Roviaro v. United States, *supra* note 43, 353 U.S. at 62, 77 S.Ct. at 628. See also

Westinghouse Elec. Corp. v. City of Burlington, *supra* note 45, 122 U.S.App.D.C. at 71, 351 F.2d at 768.

52. Roviaro v. United States, *supra* note 43, 353 U.S. at 62, 77 S.Ct. at 629. See also McCray v. Illinois, *supra* note 45, 386 U.S. at 310–311, 87 S.Ct. 1056.

53. Roviaro v. United States, *supra* note 43, 353 U.S. at 62, 77 S.Ct. at 629. See also McCray v. Illinois, *supra* note 45, 386 U.S. at 310–311, 87 S.Ct. 1056 ; Rugendorf v. United States, 376 U.S. 528, 534–535, 84 S. Ct. 825, 11 L.Ed.2d 887 (1964) ; United States v. Skeens, 145 U.S.App.D.C. 404, 407–408, 409, 449 F.2d 1066, 1069–1070, 1071 (1971) ; Westinghouse Elec. Corp. v. City of Burlington, *supra* note 45, 122 U.S. App.D.C. at 71, 351 F.2d at 768.

54. See McCray v. Illinois, *supra* note 45, 386 U.S. at 309, 87 S.Ct. 1056.

55. United States v. Bell, *supra* note 18.

56. United States v. Bell, *supra* note 18, 341 F.Supp. at 276.

57. *Id.*

58. *Id.*

structions given to the jury,[59] it posed the risk normally attendant upon impeachment by evidence indicative of another crime.[60] Nonetheless, the judge reminded, "the transaction in which the informant was involved came out on rebuttal after having been opened up by [Bell's] own ill-advised remarks,[61] and was cumulative of other similar evidence presented by police witnesses during the Government's case in chief which linked [Bell] to other narcotic-like transactions on other dates."[62] The judge also noted that "[t]he informant was neither a participant in nor a witness to the crime charged,"[63] and that, notwithstanding the informant's unavailability, Bell was not without other means of probing and testing the impeachment incident had he been inclined to do so.[64]

We think the trial judge singled out considerations bearing importantly on the decision he was summoned to render. The occasion for the Government's impeachment effort arose when Bell gratuitously asserted on cross-examination that he had never seen narcotics save on television,[65] and the impeaching testimony was directed solely to that claim.[66] Conceivably the informant could have denied the alleged drug sale, but he was not the only one who might have cast doubt on it. As the trial judge observed, "[t]he informant only served a mechanical function of taking the money from the police, within their view pur-

59. In his general charge, the trial judge told the jury that he had ruled that the Government was not compelled to produce the informant as a witness, and that no inference was to be drawn for or against either the Government or the accused in consequence of the informant's nonappearance. The judge further instructed that Officer Miller's rebuttal testimony was not proof of the charges against Bell, but could be considered only in relation to his credibility.

60. United States v. Bell, *supra* note 18, 341 F.Supp. at 276. See Part II(A), *supra*.

61. On cross-examination of Officer Miller, the defense brought out that Bell was a constant fisherman and frequently had been observed using Fisherman's Wharf before his arrest. On redirect examination of the officer, the trial judge ruled that this line of questioning had "opened the door" to a full examination of Bell's prearrest activities on the wharf, and Officer Miller was permitted to state that

[o]n numerous occasions Mr. Bell, Mr. Cardwell and Mr. Davis were observed by me exchanging tinfoils on numerous occasions and receiving an unknown amount of money on numerous occasions.

Arguably, the judge's inquiry regarding admissibility of this testimony might have run deeper. "[O]pening the door is one thing. But what comes through the door is another," United States v. Winston, 145 U.S. App.D.C. 67, 71, 447 F.2d 1236, 1240 (1971), and the admissibility of evidence revealing another offense "depends upon a plus-quality in terms of its evidentiary capability in balance with its harmful portent." Bradley v. United States, *supra* note 28, 140 U.S.App. D.C. at 14, 433 F.2d at 1120. See also text

*supra* at notes 24–29. Since, however, no point in this connection is raised or briefed on this appeal, we do not consider it. See Rone v. Rone, 78 U.S.App.D.C. 369, 141 F. 2d 23 (1944); Minnesota Min. & Mfg. Co. v. Coe, 73 App.D.C. 146, 148, 118 F.2d 593, 595 (opinion on rehearing), cert. denied, 314 U.S. 624, 62 S.Ct. 89, 86 L.Ed. 501 (1941); Brown v. Sielaff, 474 F.2d 826, 828 (3d Cir. 1973); United States v. White, 454 F.2d 435, 439 (7th Cir. 1971), cert. denied, 406 U.S. 962, 92 S.Ct. 2070, 32 L.Ed.2d 350 (1972); Pedicord v. Swenson, 431 F.2d 92, 93 (8th Cir. 1970); United States v. Ewing, 445 F.2d 945, 949, n.8 (10th Cir. 1971). See also Fed.R.App.P. 28(a)(2), (4).

62. United States v. Bell, *supra* note 18, 341 F.Supp. at 276.

63. Id.

64. *Id.*

65. It all started when Bell, asked whether Cardwell and Davis "were selling narcotics" on the offense date, volunteered that he had "never seen any of them." See note 21, *supra*.

66. Bell argues that even apart from nondisclosure of the informant's identity, allowance of the impeachment was error. Already in this opinion we have spoken to the constant need to weigh the probative value of evidence against its prejudicial proclivities in deciding whether it should be admitted. See Part II(A), *supra*. Since, however, we hold ultimately that admission of Officer Miller's rebuttal testimony was not prejudicial in the circumstances of this case, we do not pass on the propriety of that testimony per se.

chasing the narcotics from the defendant, and bringing the narcotics to the police."[67] As the judge further observed, Officer Miller was available for cross-examination on all aspects of the incident,[68] and in fact he was subjected to unrestricted questioning on that score; and according to Officer Miller, Cardwell and Davis were also present at the transaction.[69] The situation, then, was not one in which prosecution testimony could be contradicted only by an unnamed informant.[70]

We think, too, as did the trial judge, that another important factor in the

equation was that the informant did not in any way participate in or witness any of the offenses on trial.[71] As we have seen, the Supreme Court has discountenanced a rule which would inexorably require revelation of an informant's identity even in that kind of situation.[72] And the courts,[73] including our own,[74] have frequently recognized that the call for disclosure may well be weaker when the informant's role did not project him into the incidents comprising the crimes charged,[75] and consequently could not enable him to testify directly to guilt or

67. United States v. Bell, *supra* note 18, 341 F.Supp. at 276.

68. *Id.*

69. We later explain why Cardwell and Davis were not used as defense witnesses. See Part III(A), *infra*.

70. Compare Roviaro v. United States, *supra* note 43, 353 U.S. at 64–65, 77 S.Ct. 623; United States v. Barnett, 418 F.2d 309, 311 (6th Cir. 1969); White v. United States, 330 F.2d 811, 813–814 (8th Cir.), cert. denied, 379 U.S. 855, 85 S.Ct. 105, 13 L.Ed.2d 58 (1964); United States v. Miramon, 443 F.2d 361, 362 (9th Cir. 1971).

71. United States v. Bell, *supra* note 18, 341 F.Supp. at 276.

72. See text *supra* at notes 48–53.

73. Marderosian v. United States, 337 F.2d 759, 760–761 (1st Cir.), cert. denied, 380 U.S. 971, 85 S.Ct. 1328, 14 L.Ed.2d 268 (1964); United States v. Konigsberg, 336 F.2d 844, 848 (3d Cir.), cert. denied, 379 U.S. 930, 85 S.Ct. 327, 13 L.Ed.2d 342 (1964); Miller v. United States, 273 F.2d 279, 281 (5th Cir.), cert. denied, 362 U.S. 928, 80 S.Ct. 756, 4 L.Ed.2d 747 (1960); Churder v. United States, 387 F.2d 825, 831–832 (8th Cir. 1968); Cook v. United States, 354 F.2d 529, 531 (9th Cir. 1965).

74. United States v. Skeens, *supra* note 53, 145 U.S.App.D.C. at 404, 449 F.2d at 1071; United States v. James, 151 U.S.App.D.C. 304, 306, 466 F.2d 475, 477 (1972) (concurring opinion).

75. So, nondisclosure of the informant's name has been sustained where he did no more than supply information serving as probable cause for a search or arrest, *e.g.*, McCray v. Illinois, *supra* note 45, 386 U.S. at 305–314, 87 S.Ct. 1056; United States v. Ventresca,

380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Aguilar v. Texas, 378 U.S. 108, 110–115, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Rugendorf v. United States, *supra* note 53, 376 U.S. at 531–536, 84 S.Ct. 825; United States v. James, *supra* note 74, 151 U.S.App.D.C. at 306, 466 F.2d at 477; United States v. Harrison, 139 U.S.App.D.C. 266, 267, 432 F.2d 1328, 1329 (1970), or a tip prompting an investigation into suspicious activity, *e.g.*, United States v. James, *supra* note 74, 151 U.S.App.D.C. at 305–306, 466 F.2d at 476–477; United States v. Skeens, *supra* note 74, 145 U.S.App.D.C. at 408, 449 F.2d at 1070; United States v. Konigsberg, *supra* note 73, 336 F.2d at 848; United States v. Mendoza, 433 F.2d 891, 894 (5th Cir. 1970), cert. denied, 401 U.S. 943, 91 S.Ct. 953, 28 L.Ed.2d 225 (1971); Jimenez v. United States, 397 F.2d 271 (5th Cir. 1968); Bruner v. United States, 293 F.2d 621, 622 (5th Cir.), cert. denied, 368 U.S. 947, 82 S.Ct. 388, 7 L.Ed.2d 343 (1961), or an introduction to a suspected dealer in narcotics, *e.g.*, United States v. Picard, 464 F.2d 215, 217 (1st Cir. 1972); Zaroogian v. United States, 367 F.2d 959, 962 (1st Cir. 1966); United States v. Soles, 482 F.2d 105, 106 (2d Cir. 1973), cert. denied, 414 U.S. 1027, 94 S.Ct. 455, 38 L.Ed.2d 319 (1973); United States v. Russ, 362 F.2d 843, 845 (2d Cir. 1969), cert. denied, 385 U.S. 923, 87 S.Ct. 236, 17 L.Ed.2d 146 (1966). But even in situations of this kind disclosure may, depending on the circumstances, be required. *E. g.*, United States v. Cappabianca, 398 F.2d 356, 359 (2d Cir.), cert. denied, 393 U.S. 935, 89 S.Ct. 294, 21 L.Ed.2d 271 (1968); United States v. Santiago, 327 F.2d 573, 575 (2d Cir. 1964); United States v. Rosario, 327 F.2d 561, 564 (2d Cir. 1964); Cochran v. United States, 291 F.2d 633, 636–637 (8th Cir. 1961); Costello v. United States, 298 F.2d 99, 100–101 (9th Cir. 1962).

innocence.[76] We do not suggest that the informant's participation in those events is a precondition to disclosure;[77] we simply honor the Supreme Court's admonition to consider "the possible significance of the informer's testimony"[78] when we say that the informant's testimonial potential may properly—and should—be taken for just what it was. Here the testimony was confined to an impeachment purpose, and its propriety is accordingly to be tested by the legal rules pertaining to impeachment.

The trial judge was also influenced by the fact that by no means was Officer Miller's rebuttal testimony the only evidence of a drug sale which Bell had participated in.[79] As part of the Government's case in chief, Officer Miller had already testified that during the pre-arrest surveillance of Pier 1, he personally observed "numerous" transactions wherein Bell, Cardwell and Davis traded tinfoil packets to others for money.[80] Typically, said Officer Miller, Bell would arrive on the pier an hour or so after Cardwell and Davis, and would deliver to them paper bags containing the packets which they dispensed. We agree with the trial judge that the Government's re-

buttal was cumulative in the sense that it addressed, this time for purposes of impeachment, one more narcotic sale in a series already long.

There is still another consideration demanding weight in the balance of "the public interest in protecting the flow of information against the individual's right to prepare his defense."[81] In his written opinion, the trial judge adverted to a Government affidavit which specified the informant's utility, past and future, in the cause of law enforcement.[82] Over a two-year period, the informant had provided reliable information to federal and District of Columbia agencies concerning illegal narcotics and illegal guns, and was one of their most valuable sources of information. That information had resulted in approximately 20 seizures of contraband, 45 arrests for violations of narcotic and gun laws, and 25 convictions. Contemporaneously with Bell's trial, the informant was cooperating on four investigations of large narcotic dealers, in which arrests were contemplated in the near future. The affidavit charged, and the facts it alleged made evident, that the disclosure which Bell sought would have destroyed the in-

---

76. See cases cited *supra* note 75.

77. See United States v. Day, 384 F.2d 464, 468 (3d Cir. 1967) (concurring opinion); State v. Martinez, 15 Ariz.App. 430, 489 P. 2d 277, 280 (1971); People v. McShann, 50 Cal.2d 802, 330 P.2d 33, 36 (1958); People v. Hunt, 4 Cal.3d 231, 93 Cal.Rptr. 197, 481 P.2d 205, 211–212 (1971); People v. Garcia, 67 Cal.2d 830, 64 Cal.Rptr. 110, 434 P.2d 366, 370–371 (1967). See also cases cited *supra* note 75. Conditioning disclosure inexorably on the informant's participation in the activities charged as criminal would be at odds with the approach charted by the Supreme Court. See text *supra* at notes 48–53. "What *Roviaro* . . . makes clear is that this Court was unwilling to impose any absolute rule requiring disclosure of an informer's identity even in formulating evidentiary rules for federal criminal trials." McCray v. Illinois, *supra* note 45, 386 U.S. at 311, 87 S.Ct. at 1063; "[t]he problem is one that calls for balancing," and "[w]hether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case. . . ." Roviaro v. United States, *supra* note 43, 353 U.S. at 62,

77 S.Ct. at 629. See also United States v. Roberts, 388 F.2d 646, 648–650 (2d Cir. 1968); Gilmore v. United States, 256 F.2d 565, 566 (5th Cir. 1958); United States v. Barnett, *supra* note 70, 418 F.2d at 311; United States v. Casiano, 440 F.2d 1203, 1205 (2d Cir.), cert. denied, 404 U.S. 836, 92 S.Ct. 123, 30 L.Ed.2d 68 (1971).

78. Roviaro v. United States, *supra* note 43, 353 U.S. at 62, 77 S.Ct. at 629.

79. United States v. Bell, *supra* note 18, 341 F.Supp. at 276.

80. See note 61, *supra*.

81. See text *supra* at note 52.

82. In light of this affidavit and Bell's quest for full identification of the informant, it seems clear that Officer Miller's divulgence of the nickname by which the informant was known to him did not lift the veil of secrecy surrounding the informant. If indeed the nickname told Bell who the informant really was, Bell's complaint in that respect must be disregarded. See United States v. Prada, 451 F.2d 1319, 1320–1321 (2d Cir. 1971).

formant's effectiveness and impaired governmental investigations into illegal drug traffic.

It was not only this "array of factors"[83] but also "the overwhelming nature of the proof"[84] that led the trial judge to conclude that the admission of Officer Miller's rebuttal testimony would not justify interference with the jury's verdict. By our assessment, the proof of the crimes charged against Bell was indeed overwhelming, and precluded any rational finding of substantial prejudice even if it could have been said that the judge's ruling on disclosure of the informant's identity was wrong.[85] Each of six arresting officers testified unequivocally that as he closed in on Pier 1, he saw Bell toss several tinfoil packets over his shoulder into the Washington Channel.[86] The packets, the testimony reveals, fell into the water a short distance from the pier and four to five feet from the boat occupied by other officers, who immediately retrieved them with a net.[87] These witnesses also described similar efforts by Cardwell and Davis, Bell's companions, to dispose of tinfoil packets, and the frustration of those efforts by recovery of the floating packets from the water by the officers in the boat.[88] Without question, the packets discarded by Bell yielded a large quantity of a mixture containing an unusually high heroin content.[89] The informant was not in position to say any-

thing in direct refutation of any of those events.

Opposing the Government's evidence was only Bell's denial that he had possessed any of the packets, and Roland Holiday's disclaimer that he had seen Bell attempting to dispose of anything.[90] Of course, had the informant contradicted Officer Miller on the impeaching transaction, Bell's credibility might have been given a boost and Officer Miller's simultaneously a demerit. But we think it highly unlikely that that would have persuaded the jury, which deliberated less than three hours, to dismiss the rest of the Government's overpowering case.

■ We recognize that any thoroughgoing weighing of the public interest in the continued flow of informant-information against the exigencies of a fair trial for the accused necessitates reconciliation of any number of competing considerations.[91] By the same token, the jurist called upon to initially strike the balance is entitled to some leeway at those points in the process at which the determinations are essentially judgmatic.[92] Beyond that, our own analysis and evaluation of the relevant factors confirms and fortifies the validity of the ruling which the trial judge made here.[93] Moreover, our review of the evidence bearing on the issue of guilt or innocence moves us to the conclusion that in any event the jury's verdict must prevail over the nondisclosure of the informant's identity.[94] We turn,

---

83. United States v. Bell, *supra* note 18, 341 F.Supp. at 276.

84. *Id.*

85. See, *e.g.*, Kotteakos v. United States, 328 U.S. 750, 763, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

86. Officer Louis Hankins was only three to four feet from Bell at the time.

87. Additionally, two packets containing narcotics were recovered from a barrel beside which Bell was standing. See text *supra* following note 8.

88. The packets Bell had were easily identifiable. See note 8, *supra*.

89. See note 10, *supra*.

90. There is considerable doubt as to whether Holiday was in position to see any attempted disposition of the tinfoil packets. See note 14, *supra*.

91. See text *supra* at notes 51–53.

92. United States v. Franzese, 392 F.2d 954, 962 (2d Cir. 1968), vacated in part on other grounds and remanded, 394 U.S. 310, 89 S. Ct. 1163, 22 L.Ed.2d 297 (1969); Wirtz v. Rosenthal, 388 F.2d 290, 291 (9th Cir. 1967); Garibay-Garcia v. United States, 362 F.2d 509, 510–511 (9th Cir. 1966).

93. See text *supra* at notes 65–82.

94. See text *supra* at notes 83–90.

then, to other contentions which Bell presses on these appeals.

## III. THE NEW-TRIAL ISSUES

After the jury returned its verdict finding Bell guilty of most of the offenses laid to him by the indictment,[95] he retained new counsel who filed a motion for a new trial alleging several errors in the conduct of the proceedings. The trial judge held an evidentiary hearing and in due course denied the motion for reasons explained in an unpublished memorandum and order,[96] which for convenience we appendicize to this opinion.[97] The appeal from denial of the motion [98] presents basically the same arguments rejected by the judge. We now address those arguments, and like the judge, find no ground for disturbing Bell's conviction.

### A. The Plea Bargains

Prior to Bell's trial, in consequence of negotiations between counsel respectively representing the Government and Bell's co-indictees, Cardwell and Davis, the latter two entered pleas to less than all of the counts in which they were charged,[99] and ultimately received sentences comparatively lighter than those which Bell was later to draw.[100] Bell

did not take that course, nor was he offered a chance to do so, and neither Cardwell nor Davis appeared as a witness at Bell's trial. Bell contends that the plea bargins unfairly and illegally singled him out for prosecution and, additionally, deprived him of the testimony of Cardwell and Davis. The record does not bear out either contention.

### —Selective Enforcement of the Law

"Similarly situated defendants should be afforded equal plea agreement opportunities." [101] That standard the American Bar Association adopted six years ago.[102] "Such equality is needed," ABA says, "to reach desired correctional goals, and to protect the process from attack on equal protection grounds." [103] Bell asserts such grounds—as Fifth Amendment entitlements [104]—but his situation falls far short of supporting them.

 That different persons receive different treatment at the hand of Government does not, without more, demonstrate constitutional inequality.[105] By the same token, the mere fact that two or more individuals are charged with the same or similar offenses does not necessarily require that a plea-offer made to one be extended to all.[106] What must be

---

95. See text *supra* at notes 1, 2, and note 5, *supra*.

96. United States v. Bell, *supra* note 20.

97. See note 20, *supra*.

98. See note 4, *supra*, and accompanying text.

99. The pleas were tendered to and accepted by a judge other than the judge who eventually presided over Bell's trial.

100. See note 5, *supra*.

101. American Bar Association, Project on Minimum Standards for Criminal Justice, Standards Relating to Pleas of Guilty 60 (Approved Draft 1968), hereinafter cited "ABA Standards."

102. See note 101, *supra*.

103. ABA Standards, *supra* note 101, at 69.

104. "We think that it may safely be decided that in the sober relationship of the citizenry to the criminal laws, the Due Process Clause of the Fifth [Amendment] contains

the same 'pledge of the protection of equal laws' as is evident from the Fourteenth. At the same time, it is clear to us that dissimilar treatment which would withstand an assault predicated upon an alleged denial of equal protection under the Fourteenth would not offend due process under the Fifth." Washington v. United States, 130 U.S.App. D.C. 374, 381–382, 401 F.2d 915, 922–923 (1968), quoting Yick Wo v. Hopkins, 118 U. S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (footnotes omitted).

105. Griffin v. County School Bd., 377 U.S. 218, 230, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Washington v. United States, *supra* note 104, 130 U.S.App.D.C. at 382, 401 F.2d at 923.

106. Newman v. United States, 127 U.S.App. D.C. 263, 382 F.2d 479 (1967). "Two persons may have committed what is precisely the same legal offense but the prosecutor is

shown is "a difference either based on a constitutionally suspect standard or lacking in rational justification."[107] For "[e]qual protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary."[108]

 Prosecutorial discretion in law enforcement, we have recognized, "is by its very nature exceedingly broad."[109] And "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation,"[110] but only so when "the selection [is] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."[111] We discern no vice of that character in this case. The Government's evidence indicated strongly that Bell was a major dealer in narcotics, and that Cardwell and Davis were subordinates functioning under his direction.[112] The prosecutor undoubtedly had this information as background when he agreed to guilty pleas by Cardwell and Davis.

Dissimilar treatment reasonably accorded persons dissimilarly situated does not implicate the equality demand of the Fifth Amendment.

### —Deprivation of Defense Testimony

 Another ground advanced in Bell's new-trial motion was that he was deprived of testimony by Cardwell and Davis because, the motion asserts, the Government conditioned its acceptance of their pleas upon their commitment to refrain from testifying in Bell's behalf. Inarguably, governmental impairment of the accused's ability to call witnesses in his behalf cannot be tolerated.[113] The trial judge dismissed Bell's claim as lacking in factual substance, however, and we think he was entirely right in doing so.

At the hearing, the litigants presented a good deal of evidence relative to the understandings which comprised the plea bargains. It appeared without controversy that Cardwell and Davis demanded an assurance, which the Government gave, that it would not call them as witnesses against Bell.[114] There was, however, a dispute as to whether the Government exacted a compact by Cardwell and Davis that they would refuse to

---

not compelled by law, duty or tradition to treat them the same as to charges. On the contrary, he is expected to exercise discretion and common sense to the end that if, for example, one is a young first offender and the other older, with a criminal record, or one played a lesser and the other a dominant role, one the instigator and the other a follower, the prosecutor can and should take such factors into account . . . ." *Id.* at 266, 382 F.2d at 481–482.

107. Washington v. United States, *supra* note 104, 130 U.S.App.D.C. at 382, 401 F.2d at 923. See also Loving v. Virginia, 388 U.S. 1, 9, 11–12, 87 S.Ct. 1817, 18 L.Ed. 1010 (1967); McLaughlin v. Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Skinner v. Oklahoma, 316 U.S. 535, 541–542, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

108. Walters v. City of St. Louis, 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660 (1954). See also Washington v. United States, *supra* note 104, 130 U.S.App.D.C. at 382, 401 F.2d at 923.

109. Washington v. United States, *supra* note 104, 130 U.S.App.D.C. at 384, 401 F.2d at 925. See also United States v. Gainey, 142 U.S.App.D.C. 262, 263, 440 F.2d 290, 291 (1971); Newman v. United States, *supra* note 106, 127 U.S.App.D.C. at 264, 382 F.2d at 480.

110. Oyler v. Boles, 368 U.S. 448, 456, 82 S. Ct. 501, 506, 7 L.Ed.2d 446 (1962).

111. *Id.*

112. See Part I, *supra*, and note 61, *supra*.

113. See Brady v. Maryland, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); United States v. Bryant, 142 U.S.App.D.C. 132, 137–138, 439 F.2d 642, 647–648 (1971); Levin v. Clark, 133 U.S.App.D.C. 6, 7–8, 408 F.2d 1209, 1210–1211 (1968); Curtis v. Rives, 75 U.S.App.D.C. 66, 68, 123 F.2d 936, 938 (1941); United States v. Bronson, 145 F.2d 939, 943 (2d Cir. 1944); Bray v. Peyton, 429 F.2d 500, 501 (4th Cir. 1970).

114. App. 38.

testify if called by Bell as witnesses in his behalf.[115] The trial judge carefully analyzed the conflicting evidence bearing on this contention[116] and found that no such undertaking had been sought or made.[117]

We need not repeat in toto the circumstances, detailed in the judge's memorandum, which led him to so hold. The judge, deeming Cardwell and Davis "unworthy of credence,"[118] found "that the prosecutor and counsel [for Cardwell and Davis] spoke loosely of preventing testimony on Bell's behalf by the pleading defendants but that the objective was only to set up a basis to impeach if they should appear, not to foreclose appearance as defense witnesses if called at Bell's trial."[119] The judge also found that "[e]ither defendant who pled guilty could have freely testified."[120] He found, too, that "Bell's retained counsel, a seasoned and respected practitioner in this Court, testified that after interviewing the co-defendants at least twice in Bell's presence he decided long before the plea bargain that they would be of no use to Bell; that their testimony would not be helpful; that Bell fully agreed with this decision; that Bell never asked to have either co-defendant called as a witness either before or during trial; and that, as counsel, he knew of no aspect of the pleas that foreclosed calling them or either of them at any

time if he decided this was desirable."[121] These evidentiary highlights, coupled with other items of lesser lights, persuaded the judge to conclude that "[t]he failure to call the former co-defendants was solely the result of the informed tactical decision of experienced retained counsel made after consultation with his client."[122] The judge further observed:

> Both defendants who pled guilty were incarcerated in the District of Columbia area, available throughout Bell's trial and could have been brought forward at any time to testify. No objection could have been made to such testimony if it had been offered. It goes without saying that a prosecutor cannot by plea bargain or otherwise prevent a witness from appearing and testifying for the defense. Any understanding of this kind would be wholly improper and no member of the Bar should condone or participate in such an arrangement.[123]

The trial judge's findings in this case are of the character which should be accepted on appeal unless clearly erroneous.[124] And "[a] finding is 'clearly erroneous' [only] when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed,"[125] that is, that "the finding

115. App. 38.

116. App. 38–40.

117. App. 40.

118. App. 38.

119. App. 38.

120. App. 38.

121. App. 39.

122. App. 39.

123. App. 39.

124. Campbell v. United States, 373 U.S. 487, 493–495, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); United States v. Washington, 154 U.S.App.D.C. 246, 247, 475 F.2d 357, 358 (1973); United States v. Sheard, 154 U.S. App.D.C. 9, 16, 473 F.2d 139, 146 (1972); United States v. Schoefield, 150 U.S.App.D.

C. 380, 382, 465 F.2d 560, 562, cert. denied, 409 U.S. 881, 93 S.Ct. 210, 34 L.Ed.2d 136 (1972); Green v. United States, 128 U.S. App.D.C. 408, 411 & n.2, 389 F.2d 949, 952 & n.2 (1967); Jackson v. United States, 122 U.S.App.D.C. 324, 326–327, 353 F.2d 862, 864–865 (1965). The test is much narrower where the finding relates to a matter peculiarly within the judge's discretion. Jackson v. United States, *supra*, 122 U.S.App.D.C. at 326 & n.2, 353 F.2d at 864 & n.2; United States v. Johnson, 327 U.S. 106, 111–112, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

125. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). See also United States v. Sheard, *supra* note 124, 154 U.S.App.D.C. at 16, 473 F.2d at 146; Jackson v. United States, *supra* note 124, 122 U.S.App.D.C. at 327, 353 F.2d at 865.

either is not supported by or is clearly against the weight of the evidence, or induced by an erroneous view of the law."[126] Authority to reject findings based on witness-credibility is even narrower, and is always to be exercised with great caution.[127] Our painstaking review of the evidence adduced at the hearing on Bell's motion for a new trial reveals more than ample evidentiary support for the trial judge's findings, including his credibility assessments, and we perceive no error of law in his rulings. We therefore sustain his action on the motion insofar as it pertains to the availability of the testimony of Cardwell and Davis for the defense.

### B. The Relationship of Defense Counsel

Bell also argues that he was deprived of effective assistance by his trial counsel[128] because of a relationship which he bore to counsel for codefendant Cardwell. In support of his motion for a new trial, Bell asserted that his attorney was associated with Cardwell's attorney in law practice in the same firm, and that matter was fully explored at the hearing on the motion. The trial judge found that assertion contrary to fact, and we think the judge's determination on that score must stand.

Indubitably, representation by a single attorney of two or more codefendants in a criminal case may vitiate an ensuing conviction.[129] The accused's Sixth Amendment right to effective assistance of counsel entitles him to a defense unaffected by counsel's allegiance to an adverse interest of another.[130] Simultaneous representation of clients having divergent interests may warp counsel's professional judgment or dilute his loyalty to one or the other,[131] and if injury therefrom befalls an accused, he must be indulged a fresh opportunity to present his defense free from compromising influences.[132]

We need not, however, decide whether these considerations might embarrass the separate representation of codefendants by members of the same law firm, for that was not the situation here. Uncontradicted evidence adduced at the hearing showed that Bell and Cardwell personally retained their respective counsel, and the trial judge found that Bell had assisted Cardwell in that effort. The evidence also disclosed that while the two attorneys shared office space, they practiced independently. On this basis, the judge found that "[t]he claims of inadequate assistance of counsel and conflict of interest [were] without any support in the record."[133]

In light of the evidence, this finding is not clearly erroneous, and we have no warrant to disturb it.[134] Beyond that, we are unable, in any event,

---

126. United States v. Sheard, *supra* note 124, 154 U.S.App.D.C. at 16, 473 F.2d at 146.

127. United States v. Sheard, *supra* note 124, 154 U.S.App.D.C. at 16, 473 F.2d at 146; Jackson v. United States, *supra* note 124, 122 U.S.App.D.C. at 327, 353 F.2d at 865. See also Smith v. United States, *supra* note 124, 122 U.S.App.D.C. at 302, 353 F.2d at 840.

128. We refer to counsel originally retained, who represented Bell until, after rendition of the verdict, new counsel was engaged.

129. See Glasser v. United States, 315 U.S. 60, 67–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942) ; Lollar v. United States, 126 U.S. App.D.C. 200, 202–204, 376 F.2d 243, 245–247 (1967) ; Campbell v. United States, 122 U.S.App.D.C. 143, 144–145, 352 F.2d 359, 360–361 (1965).

130. See cases cited *supra* note 129.

131. See cases cited *supra* note 129.

132. Glasser v. United States, *supra* note 129, 315 U.S. at 75–77, 62 S.Ct. 457; Lollar v. United States, *supra* note 129, 126 U.S.App. D.C. at 203–205, 376 F.2d at 246–248; Campbell v. United States, *supra* note 129, 122 U.S.App.D.C. at 145, 352 F.2d at 361.; Wynn v. United States, 107 U.S.App.D.C. 190, 191–192, 275 F.2d 648, 649–650 (1960) ; Lebron v. United States, 97 U.S.App.D.C. 133, 137, 229 F.2d 16, 20 (1955), cert. denied, 351 U.S. 974, 76 S.Ct. 1035, 100 L.Ed. 1492 (1956).

133. App. 40.

134. See text *supra* at notes 124–126.

to discern any prejudice to Bell. Since Cardwell did not stand trial, the usual spectre of injury—from inconsistent intrial courses of action for multiple clients—could not possibly materialize.[135] Bell's only suggestion of harm is that the cotenancy of the two attorneys in the same professional quarters may have swayed the decision to omit Cardwell and Davis as defense witnesses. That approach, however, is plainly foreclosed by the trial judge's separate finding that the decision, which Bell endorsed, was dictated by entirely different considerations.[136] In sum, counsel did not have the affinity that Bell charged, and " 'we can find no basis in the record for an informed speculation' that [Bell's] rights were prejudicially affected" [137] by the relationship that actually did exist.

## C. *The Prosecutor's Closing Argument*

 But one of Bell's remaining contentions merits extended discussion.[138] The prosecutor's final statement in summation to the jury was that Bell

> profits from the poor people of this community. The poor people who shell out their money for the filth that he causes to be sold. That is how he profits. He profits of the worst kind.

Bell argues that this remark was unsupported by any evidence adduced at trial, and was so inflammatory as to jeopardize the impartiality of the jurors who were to pass judgment upon him. We agree the prosecutor's comment was inflammatory and outside the evidence, but disagree that in the overall circumstances of the case reversal of Bell's conviction is warranted.

 The record contains no evidence indicating that Bell caused sales of narcotics to be made to "the poor people of this community." A jury may consider only the evidence properly laid before it during the course of the trial.[139] Counsel's arguments to the jury must be confined to the evidence admitted

135. See United States v. Thornton, 149 U.S. App.D.C. 203, 204, 462 F.2d 307, 308 (1972).

136. See text *supra* at notes 121–122.

137. Lollar v. United States, *supra* note 129, 126 U.S.App.D.C. at 204, 376 F.2d at 247, quoting Anderson v. United States, 122 U.S. App.D.C. 277, 279, 352 F.2d 945, 947 (1965), in turn quoting Shelton v. United States, 120 U.S.App.D.C. 65, 66, 343 F.2d 347, 348, cert. denied, 382 U.S. 856, 86 S.Ct. 108, 15 L.Ed.2d 93 (1965).

138. Bell sought a new trial additionally on the basis of a post-verdict disclosure by Officer Miller, the Government's principal witness. In an affidavit appended to the Government's opposition to a post-conviction bail motion filed by Bell, Officer Miller stated that he had been informed that Bell owned property in Bimini, and that during the period of Bell's pretrial release he had received from Bell a postcard bearing a Bimini postmark. Bell denied that he had sent the postcard, or was ever in Bimini. Seemingly, Officer Miller did not mention the postcard incident to the prosecutor until after the verdict was returned, despite its potential value to the Government's theory that Bell was engaged in a lucrative enterprise in narcotics. Bell characterizes the officer's recital of the incident as a falsehood, and an omen of bias. The trial judge deemed such an omission insufficient to undermine the officer's credibility, app. at 40, and we agree that it lacks sufficient significance to warrant a new trial. See, *e.g.*, United States v. Gaither, 142 U.S.App.D.C. 234, 236, 440 F.2d 262, 264 (1971); United States v. Alexander, 139 U.S.App.D.C. 163, 165, 430 F.2d 904, 906 (1970); Smith v. United States, 109 U.S.App.D.C. 28, 30, 283 F.2d 607, 609 (1960), cert. denied, 364 U.S. 938, 81 S.Ct. 387, 5 L.Ed.2d 369 (1961); Wilkins v. United States, 97 U.S.App.D.C. 66, 67, 228 F.2d 37, 38 (1956); Murphy v. United States, 91 U.S.App.D.C. 118, 198 F. 2d 87 (1952).

Bell also contends that the sentence imposed upon the narcotic counts were illegal because the sentencing judge should have utilized the more lenient provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L.No. 91–513, 84 Stat. 1242 (1970), 21 U.S.C. § 801 et seq. (1970). This argument is foreclosed by the Supreme Court's decision in Bradley v. United States, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973).

139. *E.g.*, Reichert v. United States, 123 U.S. App.D.C. 294, 298, 359 F.2d 278, 282 (1966); Cross v. United States, 122 U.S. App.D.C. 283, 285, 353 F.2d 454, 456 (1965); Johnson v. United States, 121 U.S. App.D.C. 19, 21, 347 F.2d 803, 805 (1965).

and to such inferences as may be reasonably deducible therefrom.[140] The observation Bell complains of was at war with these wholesome principles. Even more fundamentally, "evidence which has the effect of inspiring sympathy for the defendant or for the victim . . . is prejudicial and inadmissible when otherwise irrelevant." [141] The economic status of the people to whom Bell supplied narcotics was "wholly irrelevant to any facts or issues in the case," [142] and could have had no effect other than to inflame the jury.

 The prosecutor's statement, then, was improper, but we cannot believe that it was so far out of bounds that it could have corrupted the jury's verdict. The proof of Bell's guilt, we have said, was overwhelming.[143] The statement under attack comprised but three sentences at the end of an otherwise proper summation covering fifteen pages of the trial transcript. We are satisfied that, however viewed, the statement was not so offensive to the truth as to imperil the fairness of the trial.

Nonetheless, this incident leaves us concerned. Despite the well known legal rules governing prosecutorial argumentation, we have, particularly of late, witnessed a growing number of similar instances of misconduct. Indeed, it seems that judicial decisions holding particular conduct improper but harmless have had but little effect on prosecutorial misbehavior. It may be that the day is near when reversal instead of admonition may become a necessary prophylactic tool to insure that prosecutorial arguments hew to the law.

The judgment of conviction appealed from is

Affirmed.

APPENDIX

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Criminal No. 2128–70

UNITED STATES OF AMERICA

v.

WILLIE BELL

MEMORANDUM AND ORDER

[Filed November 2, 1972]

This Motion for New Trial has presented several issues.

Primarily, Bell contends that he was precluded from presenting favorable testimony of major import from two former co-defendants because they were prevented from testifying by a commitment exacted by the prosecutor as part of the plea bargain at the time their guilty pleas were taken by another Judge. A full hearing was held on this issue.

Whenever minor defendants are severed by a plea bargain, the prosecutor considers taking steps to minimize the possibility that once the bargain is consummated the severed defendants will seek to exonerate the remaining defendant by false or incomplete testimony. It is the practice in this jurisdiction for the prosecutor to tie the pleading severed defendant to key facts either by a detailed account at allocution or by taking a signed statement for later impeachment use if necessary. Although Bell was considered by the prosecutor to be a major narcotic violator, the prosecutor in this instance failed to take statements from the minor defendants who pled guilty and the facts developed at allocution did not implicate Bell in any detail.

---

140. Luttrell v. United States, 320 F.2d 462, 465 (5th Cir. 1963) ; United States v. Holt, 108 F.2d 365, 370 (7th Cir.), cert. denied, 309 U.S. 672, 60 S.Ct. 616, 84 L.Ed. 1018 (1940) ; Brennan v. United States, 240 F.2d 253, 263 (8th Cir.), cert. denied, 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 723 (1957).

141. 1 Wharton's Criminal Evidence § 164 at 304 (13th ed. 1972).

142. Brown v. United States, 125 U.S.App.D. C. 220, 224, 370 F.2d 242, 246 (1966), quoting Viereck v. United States, 318 U.S. 236, 247, 63 S.Ct. 561, 87 L.Ed. 734 (1943).

143. See text *supra* at notes 84–90.

During the plea negotiations, however, the defendants who were each close friends of Bell and assisted by him financially wanted assurance that if they pled guilty they would not be called by the Government to testify against Bell. This assurance was given and recorded in open court before the Judge who took the pleas. So much is undisputed. The proof was in sharp conflict, however, as to whether an agreement barring the pleading defendants from testifying, if called by Bell, was also exacted. Both defendants and one of their attorneys say this is what in effect occurred while the prosecutor denies that such was the case. The prosecutor who arranged the pleas left for private practice before Bell's trial and turned his file over to his successor. The U. S. Attorney's jacket contains no indication of any such arrangement. This prosecutor, moreover, denied that any such commitment was exacted as part of the pleas.

Both defendants are unworthy of credence. Their testimony at the hearing was at variance with their affidavits in support of the motion, their comprehension was limited, and their motive to falsify is apparent. The Court concludes that the prosecutor and counsel spoke loosely of preventing testimony on Bell's behalf by the pleading defendants but that the objective was only to set up a basis to impeach if they should appear, not to foreclose appearance as defense witnesses if called at Bell's trial. The Judge taking the pleas was not advised of such an understanding and the plain fact of the matter is that the prosecutor failed to take the proper precautions to foreclose testimony by obtaining a full statement at allocution or otherwise. Either defendant who pled guilty could have freely testified.

Bell's retained counsel, a seasoned and respected practitioner in this Court, testified that after interviewing the co-defendants at least twice in Bell's presence he decided long before the plea bargain that they would be of no use to Bell, that their testimony would not be helpful; that Bell fully agreed with this decision; that Bell never asked to have either co-defendant called as a witness, either before or during trial; and that, as counsel, he knew of no aspect of the pleas that foreclosed calling them or either of them at any time if he decided this was desirable. The attorney for one of the defendants, who believed an arrangement against testifying had been made, also felt his client could not help either his own or Bell's case. Bell gave some general contrary testimony, but the jury at the trial rejected his explanations and excuses and the Court also considers his testimony unworthy of belief.

Bell was not party to any of these dealings. Both defendants who pled guilty were incarcerated in the District of Columbia area, available throughout Bell's trial and could have been brought forward at any time to testify. No objection could have been made to such testimony if it had been offered. It goes without saying that a prosecutor cannot by plea bargain or otherwise prevent a witness from appearing and testifying for the defense. Any understanding of this kind would be wholly improper and no member of the Bar should condone or participate in such an arrangement.

Although a substantial period elapsed between the pleas and Bell's trial, it is significant that Bell, who was on bond, made no effort to communicate with the other defendants about possible testimony after he and his lawyer rejected them as undesirable witnesses and neither of them communicated with him. The failure to call the former co-defendants was solely the result of the informed tactical decision of experienced retained counsel made after consultation with his client. The claims of inadequate assistance of counsel and conflict of interest are without any support in the record.

The Motion for New Trial also claims that favorable defense evidence, a photograph, was withheld and that a police officer who testified against Bell was shown by later developments to be prejudiced. These claims lack substance. It is not established that any colored photograph was ever taken of Bell. Nor did

defendant request its production during trial. As for the claim of the police officer's prejudice, it appears that the police officer claims to have received postcards purporting to come from Bell in the Bahamas and that Bell says he never was in Bimini and never sent the postcards. Bell apparently implied to counsel he owned property in the Caribbean. All of this came up post-trial at a bond hearing and is insufficient to undermine the officer's credibility or to constitute newly discovered evidence.

The Motion for New Trial is in all respects denied.

So ordered.

Gerhard A. Gesell,
United States District Judge
November 2, 1972.