Irene A. **AWKARD**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 18723.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 5, 1964.

Decided June 3, 1965.

642

Miss Diana K. Powell, Washington, D. C., for appellant.

Mr. Henry H. Jones, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Frank Q. Nebeker and Miss Barbara A. Lindemann, Asst. U. S. Attys., were on the brief, submitted on the brief for appellee.

Before BAZELON, Chief Judge, and WASHINGTON and WRIGHT, Circuit Judges.

WASHINGTON, Circuit Judge.

Appellant was convicted of simple assault and assault with intent to kill. The facts were disputed, but there was clearly sufficient evidence for the jury to convict.

 Although the trial judge conducted the trial with great caution, we think error was committed requiring reversal. As a part of her defense, appellant put on two character witnesses to testify to her good reputation.[1] The prosecuting attorney, on cross-examination, asked both of them whether they had heard of appellant's two previous arrests for assault with a dangerous weapon and her conviction for disorderly conduct.[2] This jurisdiction apparently has endorsed the general rule that the prosecutor can in some circumstances inquire on cross-examination whether a defendant's character witness "has heard" of defendant's prior arrests or convic-

1. McCORMICK EVIDENCE § 158 (1954). In this jurisdiction the reputation subject to proof is supposed to be defendant's good reputation for the trait of character involved in the offense charged. Morris v. District of Columbia, 75 U.S. App.D.C. 82, 124 F.2d 284 (1941). The reputation to be proved should be the defendant's reputation in the community in which he lives at the time of the alleged crime or shortly preceding that time. Lomax v. United States, 37 App. D.C. 414, 418 (1911).

2. Appellant had been arrested in 1963 and 1964 for assault with a deadly weapon. Both arrests grew out of domestic quarrels, upon complaint of her husband. The "conviction" was a forfeiture of collateral, also arising from a domestic quarrel.

tions.[3] Such cross-examination is not admitted to establish that such events took place, but only to test the foundations and reliability of the witness' testimony.[4] It is, in general, inadmissible to establish the defendant's bad character or his propensity to commit the crime charged, and the defendant is entitled to a limiting instruction. Nonetheless, the risks of undue prejudice to the defendant are great;[5] and the inadequacy of a cautionary instruction to protect the interests of the defendant is obvious. Michelson v. United States, 335 U.S. at 484–485, 69 S.Ct. at 222–223. Cf. Jones and Campbell v. United States, 119 U.S. App.D.C. 213, 214, 215 n. 4, 338 F.2d 553, 554–555 n. 4 (1964) ; Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) ; Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

▮ The use of such evidence must be closely supervised by the trial judge, not only to assay the prosecuting attorney's good faith but to consider whether the probative value of the information which might be elicited outweighs the prejudice to the defendant. The Supreme Court's *Michelson* decision, while it sustained the practice of cross-examining character witnesses on the defend-

3. The precise scope for cross-examination on these matters is unclear. See Sacks v. United States, 41 App.D.C. 34 (1913) ; Clark v. United States, 57 App. D.C. 335, 23 F.2d 756 (1927) (matters raised on cross-examination must "bear reference to the nature of the charge against" the defendant) ; Stewart v. United States, 70 App.D.C. 101, 104 F.2d 234 (1939) "the prosecuting attorney may ask if the witness has heard of conduct negativing a favorable reputation" ; Josey v. United States, 77 U.S. App.D.C. 321, 135 F.2d 809 (1943) (cross-examination should be limited to "acts inconsistent with the trait of character about which the witness has testified"). *Cf.* Harrison v. District of Columbia, 95 A.2d 332 (D.C.Munic.Ct.App. 1953) (character witness in a paternity suit who testified that he had never heard anything bad about the defendant was properly cross-examined on whether he had heard of defendant's having been arrested for assault) ; Michelson v. United States, 335 U.S. 469, 483–484, 69 S.Ct. 213, 93 L.Ed. 168 (1948).
The "general rule" is not universally accepted. See cases collected in McCormick, *op.cit. supra* § 158, p. 335 n. 14. See, also, the dissent by Justice Rutledge in *Michelson, supra* at 488, 69 S. Ct. at 224. He states:
"My own preference and, I think, the only fair rule would be to foreclose the entire line of inquiry concerning specific incidents in the defendant's past, both on cross-examination and on new evidence on rebuttal." 335 U.S. at 496, 69 S.Ct. at 228.

4. "The rationale given for allowing such questions is that, if answered affirmatively, they might cast serious doubt on the witness's testimony, thus serving a legitimate rebuttal function, and that, if answered negatively, they would show that the witness did not know enough about the accused's reputation to testify." Note, 70 YALE L.J. 763, 779 (1961).

5. Wigmore comments on the prejudicial effect of such cross-examination, III WIGMORE, EVIDENCE § 988 (1940) :
"The rumor of the misconduct, when admitted, goes far, in spite of all theory and of the judge's charge, towards fixing the misconduct as a fact upon the other person [defendant], and thus does three improper things,—(1) it violates the fundamental rule of fairness (*ante*, § 979) that prohibits the use of such facts, (2) it gets at them by hearsay only, and not by trustworthy testimony, and (3) it leaves the other person [defendant] no means of defending himself by denial or explanation, such as he would otherwise have had if the rule had allowed that conduct to be made the subject of an issue. Moreover, these are not occurrences of possibility, but of daily practice. This method of inquiry or cross-examination is frequently resorted to by counsel for the very purpose of injuring by indirection a character which they are forbidden directly to attack in that way; they rely upon the mere putting of the question (not caring that it is answered negatively) to convey their covert insinuation. The value of the inquiry for testing purposes is often so small and the opportunities of its abuse by underhand ways are so great that the practice may amount to little more than a mere subterfuge, and should be strictly supervised by forbidding it to counsel who do not use it in good faith."

ant's prior arrests, stressed the need for the exercise of judicial discretion in deciding whether to permit this line of cross-examination. "Wide discretion is accompanied by heavy responsibility on trial courts to protect the practice from any misuse." 335 U.S. at 480, 69 S.Ct. at 221.[6] Yet the rules as formulated in this jurisdiction [7] might appear to suggest that the judge's role is a mechanical one: if the defendant puts on a character witness, the prosecutor may ask if the witness has heard of defendant's prior arrests or convictions, without a further exercise of judicial discretion. The supposed automatic operation of the rule is suggested by the metaphorical statement that the defendant "has opened the door." But the Supreme Court has made it clear that even though the defendant has opened the door, the trial judge is to decide what passes through. Cf. Luck v. United States, 121 U.S.App.D.C. ——, 348 F.2d 763 (1965).

■ In the light of these principles, the trial judge in the instant litigation clearly erred in permitting the prosecuting attorney to cross-examine defendant's character witnesses on appellant's prior arrests and conviction. It is unclear whether the trial judge knew that it is within his discretion to exclude this line of questioning.[8] The information about the prior arrests came in during the cross-examination of defendant's first character witness, Reverend Norman Kelly. The witness testified on direct that defendant had been a member of his church choir, and that her reputation for peace and good order in Spencer-

ville, Maryland, about fifteen miles from the District, had been good. Cross-examination brought out that Reverend Kelly knew defendant when "she was just a kid," and that she had left Spencerville about three years previously. He knew nothing about her reputation in Washington, where she had lived since leaving Spencerville. The defendant's arrests and conviction had all taken place after she left Reverend Kelly's community. With these facts established, defense counsel asked for a bench conference and "questioned the admissibility" of the prior conviction and arrests. The judge ruled that this line of questioning was proper.[9] The information elicited was highly prejudicial; the character witness' testimony was weak to begin with since it went to an earlier period and a different community; it had already been impeached and could be impeached further without reference to the prior arrests. Indeed, the prosecuting attorney could have had the character testimony stricken since it did not relate to defendant's reputation in the community in which she lived or worked at the time of the alleged crime. Lomax v. United States, supra, 37 App.D.C. at 417–418. Under these circumstances, the trial judge abused his discretion in permitting cross-examination on defendant's prior arrests and conviction.

The cross-examination of defendant's other character witness, Delores Thomason, her former supervisor, was also improper. On direct examination, Miss Thomason testified that she did not know defendant's reputation in the community

---

6. Justice Frankfurter, while expressing sympathy with the position of the dissenters, joined the majority opinion, but expressly placed his reliance on the discretion of the trial judges.

7. See note 3, supra.

8. The trial judge stated that the prosecuting attorney had a "right" to test a character witness' credibility by questions on prior convictions. As will be seen, if

he thought he had discretion to exclude such questions, he exercised it too loosely in this case.

9. Although defense counsel did not object to the similar cross-examination of her second character witness, she had ample reason to believe that such objection would be futile. We think that she adequately presented her objection to both cross-examinations to preserve the point for appellate review.

for peacefulness and good order, the character traits relevant to the crime charged. The prosecuting attorney could have objected at this point and had her testimony excluded. See Morris v. District of Columbia, *supra*.[10] Miss Thomason testified only that she had "never had any complaints about Irene's [appellant's] behavior or any complaints about her work." On cross-examination, the prosecuting attorney immediately established that the witness knew nothing about appellant after 1961. Despite this fact the prosecuting attorney asked whether the witness had heard of appellant's arrests in 1963 and 1964 for assault with a dangerous weapon and her conviction for disorderly conduct in 1962. Her ignorance of these post-1961 events could not have impeached her testimony; her repeated assertions that she knew nothing about the defendant since 1961 precluded any likelihood that she would know of arrests subsequent to that year. This line of questions could not be thought to test the accuracy, reliability, or credibility of the testimony; it served only to prejudice the defendant by the introduction of past offenses.[11]

Intimations of past crimes, especially crimes similar to the crime charged, are extremely damaging to an accused. Merely putting the question, even if the witness has no knowledge of the events adverted to, creates in the minds of the jurors the impression that the events had occurred.[12] Cautionary instructions,

10. In closing to the jury, the prosecuting attorney stressed that neither of the character witnesses offered evidence of the defendant's reputation in the community in which she lived at the time of the crime:

"And I don't care if up to three years ago she [the accused] went to church every day in the week or she worked as a nurses's [sic] aid or whatever else she did back in 1959 or 1960."

11. Miss Thomason testified on direct that she only knew the defendant through their employment connection. The cross-examination proceeded as follows:

"Q Ma'am, when did this employment terminate, in 1960?

"A She came back for a little while, I believe, a couple of months, or perhaps a little more in the early part of '61, if I remember correctly.

"Q Well, then, am I correct in understanding that you know nothing about the defendant's reputation in any community after 1961?

"A No. [Taken in context, this reply clearly was intended to mean that the witness knew nothing about defendant after 1961. The next question indicates that the prosecuting attorney so understood it.]

"Q And you know nothing about her reputation in the Washington community?

"A No.

"Q Had you heard, ma'am, in your community that the defendant had been convicted in 1962 of disorderly conduct?

"Q I hadn't heard anything from Irene until I got a call to come in.

"Q Had you heard that she had been arrested in 1963 for assault with a dangerous weapon?

"A I did not.

"Q Had you heard that she had been arrested in 1964 for assault with a dangerous weapon?

"A As I say, I haven't heard from Irene since 1961 when she left our employ.

"Q And you also had not heard, madam, that she had been arrested in this matter for simple assault and assault with intent to kill, I believe that is?

"A I have not.

"Q And if that had been heard in the community in which you speak of, would that have affected the judgment in that community as to her reputation for peace and good order?

"A I am not in a position to say that. I do not know that. That would be conjecture on my part.

"Q And you know nothing of her reputation in the Washington community generally since 1961?

"A I did not know she is living in Washington. In fact, I lost track of her completely since she left our employ."

12. Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *contra*, Sacks v. United States, 41 App. D.C. 34, 36 (1913).

The fact that the prior events were arrests is particularly damaging. To the layman, arrest often is regarded as the equivalent of a finding of guilt.

copiously provided by the trial judge in this case, do not give the accused adequate protection. They cannot prevent the jury from considering prior actions in deciding whether appellant has committed the crime charged. The courts need not rest on the assumption that juries can compartmentalize their minds and hear things for one purpose and not for another. The Supreme Court took the lead in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), by going behind the historic assumptions of the law of evidence and considering the psychological reality of the jury's functioning, in that case as it related to its consideration of the voluntariness of confessions.[13]

The use of this mode of impeachment must be closely supervised and cautiously limited. In the instant case the cited questions were clearly improper; their effect was highly prejudicial, and they did not fulfill the only purpose for which such cross-examination is admitted. The use of cross-examination of a character witness to show defendant's prior arrests has been much criticized but widely practiced. We do not reverse this long practice at this time. We do, however, urge the trial judges to confine the use of such cross-examination to those situations in which it is highly relevant to establish a character witness' reliability; and even in those situations, to exercise their discretion and exclude the cross-examination where prejudice outweighs probative value.[14]

In the light of these principles, the trial judge in the instant case clearly abused his discretion in permitting the prosecuting attorney to cross-examine defendant's character witnesses on appellant's prior arrests. The case is therefore

Reversed.

---

13. In Michelson v. United States, *supra*, Justice Jackson, writing for the majority, recognized the fact that "the jury almost surely cannot comprehend the Judge's limiting instructions." He justified his adherence to the old rule on the ground that pulling "one misshapen stone out of the grotesque structure" of the law in this area would be "more likely simply to upset its present balance between adverse interests than to establish a rational edifice." 335 U.S. at 484, 486, 69 S.Ct. at 223, 224. He stated that a rational approach to this problem would be useless unless other rules of evidence were similarly reappraised. But the Supreme Court has embarked on the enterprise, so the force of this argument is diminished. In Jackson v. Denno, *supra*, the Court asked rhetorically:
"If it finds the confession involuntary, does the jury—indeed, can it—then disregard the confession in accordance with its instructions? If there are lingering doubts about the sufficiency of the other evidence, does the jury unconsciously lay them to rest by resort to the confession? Will uncertainty about the sufficiency of the other evidence to prove guilt beyond a reasonable doubt actually result in acquittal when the jury knows the defendant has given a truthful confession?" 378 U.S. at 388, 84 S.Ct. at 1787.
We need not consider whether the Jackson v. Denno approach weakens the authority of the Michelson decision. It does, however, reinforce our view that great caution should be exercised in permitting this line of questioning. See also Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

14. McCormick suggests the use of a bench conference out of the hearing of the jury to explore the grounds of the prosecutor's questions, McCORMICK, EVIDENCE § 158, p. 337; and the Supreme Court in *Michelson* commends this practice. 335 U.S. at 481, 69 S.Ct. at 221. The bench conference would also permit the judge to weigh considerations of prejudice and probative value.