**UNITED STATES of America**

v.

**William A. HINKLE, Appellant.**

**No. 24273.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 8, 1971.

Decided July 19, 1971.

# 1158

Mr. M. Michael Cramer, Washington, D. C., with whom Mr. John G. Perazich, Washington, D. C. (both appointed by this court) was on the brief, for appellant.

Mr. Charles F. Flynn, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry, Asst. U. S. Atty., and Axel H. Kleiboemer, Asst. U. S. Atty., at the time the brief was filed, were on the brief, for appellee.

Before BAZELON, Chief Judge, and LEVENTHAL and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

Appellant, convicted by a jury of armed robbery [1] and two counts of assault with a dangerous weapon,[2] was sentenced to concurrent terms of imprisonment of three to fifteen years for armed robbery and of three to ten years on each count of assault with a dangerous weapon. On this appeal appellant principally attacks his identification by two victims (Arthur and Smith) as being tainted, suggestive and improper. We affirm.

I

Appellant's first contention is that there was no independent source for an in-court identification by Mr. Arthur, the principal witness for the Government. Two men robbed a grocery store and departed via an alley located next to it. The owner, Mr. Arthur, stepped out the door and fired five shots at the men but apparently did not hit them. He then called police. One of the first officers to arrive on the scene walked through the alley in an attempt to determine whether any of the men had been hit. As he was returning to the store, an unidentified man handed him a stack of papers, indicating that they had been dropped by one of the fleeing men. The man refused to give his name, saying that he did not want to become involved.[3]

Included in the stack of papers—which the police officer noted was dry despite recent heavy rainfall—was appellant's driver's license containing his picture. On his return to the store, the officer showed the photograph of appellant to Mr. Arthur who identified the picture as being that of one of the robbers. At this same time the photograph was also seen by one Smith, an employee of Arthur's and also a witness to the robbery, but he apparently failed to identify appellant at that time.[4]

Two weeks later, Arthur identified appellant at a lineup. At trial, he indicated that during the robbery he had watched appellant for from three to four minutes in the well-lighted store and that appellant was never more than about eight feet from him at the time. He also gave a description of the robbers to police at the time of the robbery, and his description of one of the suspects described ap-

---

1. D.C.Code §§ 22–2901, 3202 (1967).

2. D.C.Code § 22–502 (1967).

3. The officer, Captain Logan, testified that one of the bystanders "sort of slipped me" the papers:

    I asked him his name. He said he didn't want to tell me; he said he didn't want no trouble and with that, he walked off very rapidly.
    Tr. 38.

4. Arthur testified that Smith identified Hinkle at this time (Tr. 28), but Smith testified that after seeing the photograph on the driver's license card he "couldn't say rightly then and there" (Tr. 165).

pellant quite well.[5] At trial Arthur was also able to testify to a scar high on appellant's cheek beside his right eye.

■ Following a thorough pretrial hearing, the court decided to suppress Arthur's identification of the robber from the registration card but held that he had an independent source and permitted him to make an in-court identification. We conclude that Arthur had ample opportunity to observe the robbers and that the court's ruling was in accord with the evidence and not clearly erroneous. United States v. Sera-Leyva, 139 U.S.App.D.C. 376, 433 F.2d 534 (1970); (Anthony) Long v. United States, 137 U.S.App.D.C. 311, 424 F.2d 799 (1969); United States v. (Clinton) Long, 137 U.S.App.D.C. 275, 422 F.2d 712 (1970). The most that appellant could expect was for the court to suppress the photographic identification which is precisely what it did.[6]

## II

■ Appellant next attacks the identification by the victim Smith, an employee of the grocery store. During the robbery Mr. Smith had an excellent opportunity to observe the robber he finally identified as Hinkle. Smith testified he looked at him for "about 5 to 10 minutes"; "standing maybe 5 feet from him"; that he was "able to look at his face at this time"; that the lighting was "good"; that he "had a good look at him"; and that the robber said "he was going to shoot me." However, despite his fine opportunity to view the robber,

Smith, immediately following the robbery, did not indicate he recognized the robber from the picture on Hinkle's driver's license and at a lineup held 16 days after the robbery Smith selected a man other than Hinkle as the robber. The Government accordingly was proceeding on the assumption that Smith could not identify the robber. However, at the very start of the trial, after a suppression hearing had already been held, Smith appeared and informed the United States Attorney that he could and would identify the robber. Thereupon the court conducted a hearing to determine whether Smith's identification testimony was admissible. At this hearing Smith testified that he told the police immediately following the robbery he could not identify the robber from Hinkle's driver's license,[7] and that he identified the wrong man at the lineup, because he was "scared for my kids, my old lady." Following this testimony the court arranged a three-man in-court lineup out of the presence of the jury and Smith selected Hinkle as the robber. Thereafter the court ruled that Smith's identification testimony was admissible and allowed him to testify as to his identification of Hinkle at the three-man court-ordered lineup and to make an in-court identification.

■ Appellant attacks Smith's identification testimony on the grounds that it was based on prior suggestion and that it was coerced by the police. However, there was no evidence of coercion and we concur in the ruling of the trial judge

---

5. The description of the two robbers, broadcast as a "lookout" which was given by Arthur to the police, read:
   Look-out for two Negro males; Number 1, Negro male, 25 years of age, 5-10 in height, weighing 130 pounds, wearing a green shirt and brown pants and carrying a .38 caliber revolver; Number 2, Negro male, 29 years of age 6-1, 180, white shirt, gray pants.
   Tr. 260.

6. Later appellant introduced the photographic evidence.

7. At the trial Smith explained he had first looked at the picture without his glasses

and had then told the police he could not identify the robber therefrom. Shortly thereafter he put on his glasses and looked at the picture a second time and told Arthur (his boss) that he "could identify," but this apparently was never communicated to the police. Smith testified:
   Q What did you tell him after looking at it a second time?
   A I didn't say anything to the police officer. He started talking to my boss. I let him talk to him.
   Q You didn't say anything?
   A He didn't say nothing to me.
   Tr. 230.

that Smith's identification of Hinkle was not based on impermissible suggestive factors. This conclusion rests upon the credibility of Smith, the fairness of the circumstances under which Smith identified Hinkle and the possession by Smith of a basis for his identification independent of the photograph. On appeal, a plausible paper attack is made by the suggestion that a comparison of weight, height and age of the three men in the lineup shows that the court-ordered lineup was impermissibly suggestive. One of the men was substantially heavier but this was minimized by placing the three men in a seated position in the second row seats of the spectators' section of the courtroom where they were only visible from above their elbows. The discrepancy in the weights of one of the men over that of Hinkle also does not disqualify the lineup since the testimony does not indicate that Smith had given any prior description of the robbers. Hinkle also exchanged his own coat with that of one of the other men and all three of the men had similar type mustaches and all were Negroes of what appears to be, and the court observed were, similar coloration. We also have the benefit of a picture of this lineup and conclude that it was fair.

█ This brings us to the argument that Smith should not have been allowed to make an in-court identification because he did not identify Hinkle from the driver's license photograph or at the first lineup, but this depends primarily on whether Smith is to be believed in his testimony as to what happened on those two occasions. The court, which had the witness before it, credited his testimony and apparently the jury did also after the defense elected to bring out the circumstances of such identification opportunities. Smith was fully cross-examined on all the details of his conduct on such occasions. The issue was one of credibility and we have no reason to reject the decisions of the court and the jury on that issue.

As to the suggestiveness of exhibiting the driver's license photograph to Smith, the court's earlier ruling suppressed that testimony (only to have it brought out by the defense) but there was ample ground for the court to rule that Smith had an independent source for his identification. The factual basis for such conclusion is fully set forth above and we interpret the court's announced ruling at the conclusion of the suppression hearing on Smith's testimony—wherein the court indicated that it considered Smith's in-court identification of Hinkle to be proof of his independent source—as a determination that Smith did possess an adequate independent source.[8] There is some suggestion that the court did not rule precisely that the lineup was fair or that Smith did have an independent source for his identification. Actually there was no contention that the first lineup was not fair and since the court itself arranged the second lineup and personally viewed the identification of Hinkle by Smith it can fairly be assumed that the court, when it permitted Smith to testify as to his identification of Hinkle at such lineup, concluded that the lineup was fair.[9]

8. THE COURT: Now, on the basis of the testimony of the witness why he didn't previously make an identification at the line-up and *on the basis of his identification of the defendant while he was seated between two other persons,* one of who [sic] he had exchanged his dark gray coat for the coat that appears to the Court to be a darker material, perhaps blue, the two other people being of what appears to the Court to be comparable age, though one witness says he was thirty-five and the general similarity in build between the subject Roy and the defendant, the general similarity in coloration of the three men might each of the three having a light-type moustache, the Court will permit the Government to call the witness Smith to make an in-Court identification. Alright.
Tr. 180 (emphasis added).

9. *See* note 8, *supra,* wherein the court presents all the items of the lineup that show its fairness.

## III

■■ The brief of appellant also contends that the trial court erred in precluding his cross-examination of the principal witness for the Government as to his bias and prejudice but this point is without merit. The court held a hearing on this matter out of the presence of the jury and ruled that it would allow cross-examination of the particular witness in question as to his general bias against Negroes and his desire to obtain a conviction in this particular case. It only imposed a slight limitation on the use of two so-called "trigger words" for which specific synonyms could be used. The court approved two questions which conveyed essentially the same thought but subsequently counsel did not ask any questions of the witness about his possible bias and prejudice.[10] We conclude that the ruling prohibiting the use of the "trigger words" was within the sound discretion of the trial judge to avoid inflaming or offending the jury.[11] We also hold that the court properly rejected an attempt by two witnesses who were unfamiliar with defendant's reputation as to the character trait in issue to testify as to his character. Michelson v. United States, 335 U.S. 469, 476, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Awkard v. United States, 122 U.S.App.D.C. 165, 352 F.2d 641 (1965).

Affirmed.

10. THE COURT: The Court recognizes that on the question of bias, considerable leeway should be allowed Counsel in showing that the witness is biased. I do not propose to put any unreasonable limitations on your showing bias. However, as we all know in this jurisdiction there are certain words that the city administration has designated trigger words. I would ask you to stay away from those trigger words. I don't think you need to go into those words. * * * Nevertheless, if Counsel could without very good reason have access to these trigger words, I think we would simply have a series of mistrials, serious mistrials. Tr. 201–202.

[THE COURT]: * * * I think that the Court's opinion on this question that the Court does have some discretion in this area, and I think you can bring out what

properly should be brought out on the stand point of the defense. Those aspects of bias on the part of the defendant without going into such trigger words as the courts have previously referred to as to whether this man is prejudice[d] against Negroes, I think you should be permitted to ask that question, but I will exclude reference to the trigger words, I think you will read this case [Austin v. United States, 135 U.S.App.D.C. 240, 418 F.2d 456 (1969)] you will find it is an adequate basis for the Court's ruling. Tr. 204.

11. Austin v. United States, 135 U.S.App. D.C. 240, 418 F.2d 456 (1969); Tinker v. United States, 135 U.S.App.D.C. 125, 417 F.2d 542, cert. denied, 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969).