Michael W. ROGERS, Appellant,

v.

UNITED STATES, Appellee.

No. 85–1421.

District of Columbia Court of Appeals.

Submitted Nov. 10, 1986.

Decided Dec. 9, 1987.

Rehearing En Banc Granted and Opinion Vacated March 8, 1988.

Peter N. Mann, Washington, D.C., appointed by this court, was on the brief, for appellant.

Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Thomas E. Zeno, and Elizabeth Trosman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before PRYOR, Chief Judge, and NEWMAN and BELSON, Associate Judges.

BELSON, Associate Judge:

This appeal presents the questions, first, whether a reputation witness may testify to "negative evidence" of a defendant's reputation, and second, whether the government may impeach a reputation witness by reference to the defendant's juvenile arrests. We hold that negative evidence of reputation is admissible but that, in this case, the trial court's exclusion of such testimony was harmless error. We also hold that the trial court properly allowed the government to test a witness' knowledge of appellant's reputation by asking whether the witness had heard that appellant had been arrested as a juvenile. We therefore affirm appellant's convictions.

I.

Appellant was convicted of distribution of phencyclidine (PCP) and cannabis (marijuana), D.C. Code § 33–541(a)(1) (1981 Supp.). At trial, the government presented testimony to the following effect: Appellant had approached an undercover police officer and asked her whether she was looking for some "herb" (meaning marijuana). The officer replied no, but said that she was looking for some "boat" (meaning PCP). Appellant walked across the street to another person, appeared to receive something from that person, and returned to the officer. The officer then gave appellant twenty-seven dollars in prerecorded police funds in exchange for two tinfoil packets containing PCP and marijuana. The officer broadcast a description of the seller, and an arrest team, on the basis of that description, arrested appellant a short time later. About twenty minutes after the sale, the purchasing officer returned to the scene and identified appellant as the man who had sold her the drugs. Appellant had no money in his possession at the time of his arrest.

Appellant, testifying in his own behalf, denied that he had sold any PCP. Rather, he testified, on the date of his arrest he had walked to a local boys club to find a friend with whom he had planned to play basketball. He stopped to talk with several other acquaintances but, not finding Abbott, left the club and went to look for him. Appellant testified that as he was walking down the street, a policeman detained him. Several other witnesses, including Abbott, corroborated appellant's testimony.

The jury found appellant guilty of distribution of phencyclidine and cannabis. This appeal followed.

## II.

Appellant first challenges the court's exclusion of testimony by Reverend David Durham, the minister of appellant's church, whom the defense had called to testify about appellant's reputation in the community for truth and veracity.

Defense counsel, attempting to lay a foundation for the witness' reputation testimony, asked Rev. Durham, "Have you heard anything spoken about the defendant and his reputation as to truth and veracity?" Rev. Durham answered, "No, I haven't." The government moved to strike the minister's testimony, arguing that he was not qualified to testify because his knowledge of appellant's "community" was limited to his church congregation, and not to the community in which appellant lived. The court granted the motion to strike not on the objected-to ground, but because appellant had not established that the witness had "actually spoken to members of the community."

Following a recess and discussion of some other matters, defense counsel asked the court's permission to recall Rev. Durham. Counsel argued that, since the minister was "in a position to have heard about" appellant's reputation, he should be allowed to testify that he had heard nothing negative about the defendant. The trial court, while not ruling immediately, eventually denied appellant's request and ruled that reputation testimony was permissible only if the witness had specifically discussed the defendant's reputation with other members of the community.

■ We agree with appellant that the trial court's ruling was error. If a witness is in such a position that he or she probably would have heard discussions in the community concerning the defendant's reputation, the witness' failure to have heard anything negative about the defendant is probative of a favorable reputation.[1] As the Supreme Court stated in *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948),

> [T]he [reputation] witness must qualify to give an opinion by showing such acquaintance with the defendant, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded. To require affirmative knowledge of the reputation may seem inconsistent with *the latitude given to the witness to testify when all he can say of the reputation is that he has "heard nothing against defendant." This is permitted upon assumption that, if no ill is reported of one, his reputation must be good.*

*Id.* 335 U.S. at 478 69 S.Ct. at 219 (emphasis added) (footnotes omitted). While this question has never been addressed directly in this jurisdiction,[2] the rule allowing testi-

---

1. The opinion in *State v. Baldanzo*, 106 N.J.L. 498, 148 A. 725 (N.J.1930), makes the point most eloquently:

   [I]t is the unusual, the abnormal, the nonconforming act that provokes talk. To behave one's self, to live decently, is to be, in those respects, normal and conventional.... There is little therein to start tongues wagging. When one departs from the conventional and does that which the majority of people do not do, then talk begins.... It does not follow, however, that a man who leads a life that, according to the standards of the neighborhood, is usual and correct and who, therefore, has not given his neighbors food for chat, holds no place in the esteem of the community. On the contrary, he may be highly regarded. The very absence of talk is an indication that the neighborhood regards him as worthy.... Shall then the man whose life has

   met the community thought as to how a person should live, and who consequently has not been talked about, be deprived of the privilege of proving this reputation when the hour of need arrives and when it may be of vital importance to him to show what the community estimate of him is? In all fairness that should not be and, according to the weight of authority, is not so.

   *Id.* at 501, 148 A. at 727.

2. *Fletcher v. United States*, 42 App.D.C. 53 (1914), held that it was proper to strike testimony by a reputation witness who testified that a government witness had a bad reputation for truth and veracity, when the reputation witness had never discussed with anyone nor heard discussed the government witness' reputation. *Id.* at 66–67. In *Fletcher*, however, the reputation witness candidly admitted that his state-

mony by a reputation witness that he or she has heard nothing bad about a defendant, although the witness was in a position to have heard such statements, is well established in other jurisdictions. *See, e.g., State v. Huffman*, 607 S.W.2d 702, 704 (Mo.Ct.App.1980); *Baldwin v. State*, 538 S.W.2d 109, 113 (Tex.Crim.App.1976); *Lowery v. State*, 39 Ala.App. 659, ——, 107 So.2d 366, 367 (1958): *State v. Gambutti*, 36 N.J.Super. 219, 232, 115 A.2d 136, 143 (1955): *cf. Wisniewski v. State*, 51 Del. 84, 94, 138 A.2d 333, 339 (1957) (witness who is well acquainted with person may testify to his or her reputation, even if witness never heard that reputation discussed). We join those jurisdictions in adopting this rule.

■■■ Although testimony as to a lack of bad reputation is thus admissible under appropriate circumstances, it is incumbent upon the trial court to assure that the absence of notoriety reflects the community's esteem rather than the witness' ignorance. Thus, negative evidence of reputation "is accepted only from a witness whose knowledge of defendant's habitat and surroundings is intimate enough so that his failure to hear of any relevant ill repute is an assurance that no ugly rumors were about." *Michelson, supra,* 335 U.S. at 478, 69 S.Ct. at 220. In the instant case, however, the exclusion of Rev. Durham's testimony was based on the court's erroneous assumption that negative evidence of reputation was improper under any circumstances, rather than on a determination that Rev. Durham was not in a position to know of appellant's reputation. We therefore hold that the trial court abused its discretion in striking Rev. Durham's testimony, and in refusing to allow appellant to recall him. *See Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979) (failure to recognize need to exercise discretion constitutes abuse of discretion).

■■■ Without deciding whether the trial court's error was of constitutional magnitude, *cf. Bassil v. United States,* 517 A.2d 714, 716–17 (D.C.1986) (error of constitu-

tional dimension to deny defense right to call witness to testify concerning government witness' bad reputation for truthfulness), we nevertheless conclude that, under either a non-constititutional harmlessness test, *see Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), or under the more stringent "harmless beyond a reasonable doubt" test, *see Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the trial court's exclusion of Rev. Durham's testimony could not have prejudiced appellant. Even assuming that proper inquiry would have revealed that Rev. Durham was sufficiently intimate with appellant's surroundings, his testimony would have been merely cumulative of the more concrete testimony of appellant's second reputation witness, who testified that she had heard people speak about appellant and that his reputation was "[t]hat he tells the truth." Furthermore, as discussed *infra,* if Rev. Durham had been allowed to testify, the government would have been permitted to probe his knowledge of appellant's reputation by inquiring whether he knew that appellant had been arrested as a juvenile. Because we are convinced that Rev. Durham's testimony could not have affected the jury's verdict, we need not remand the question of whether he was in a position to have known if appellant had had a bad reputation for truth and veracity.

### III.

■■■ Appellant next challenges the trial court's ruling that the prosecutor could ask appellant's reputation witness whether she had heard about appellant's juvenile arrests.

Before the defense began to present its case, the prosecutor inquired as to whether he could use appellant's record of juvenile arrests to impeach defense witnesses who would testify about appellant's reputation for truth and veracity. In the course of a colloquy among the prosecutor, defense

---

ment that the government witness' reputation "was bad" was based only on his own behalf, and not the opinion of others. *Id.* at 66. Furthermore, we think it obvious that while lack of

community discussion may reflect a person's *good* reputation, it is not probative of a person's *bad* reputation. *See Gilson v. State,* 140 Tex. Crim. 345, 346, 145 S.W.2d 182, 183 (1940).

counsel, and trial judge, it was revealed that, of the three arrests that the prosecutor wished to raise, two had been dismissed and one had resulted in a consent decree.[3] Initially, based on the respective outcomes of the arrests, the trial court ruled that the potential prejudice of allowing questions about them outweighed any probative value. Later, however, the court reversed its ruling and allowed the prosecutor to ask appellant's reputation witness about the arrests. The witness answered that she had not heard about the arrests. The court immediately instructed the jury that the questions were "not intended to establish that those events took place, but only to attest the reliability of the character [witness]'s testimony."

This court has recently addressed the propriety both of asking reputation witnesses about a defendant's juvenile adjudications, and of asking about "bad acts" underlying such adjudications. We ruled that, while inquiry into "bad acts" is permissible, inquiry into adjudication is not. *See Devore v. United States*, 530 A.2d 1173, 1175 (D.C.1987); *McAdoo v. United States*, 515 A.2d 412, 418 (D.C.1986). In *McAdoo*, we reasoned that questions about a defendant's juvenile adjudications have no legitimate probative value because the confidentiality that attaches to juvenile records makes it unlikely that a witness will have heard talk about the adjudications. *Id.* at 419; *cf.* D.C.Code § 16–2331 (1981) (confidentiality of juvenile case records). We added that such questions are highly prejudicial, in part because they "plant[ ] an impression which the character witness is not in a position to counteract."

*Id.* Finally, we noted, questions about juvenile adjudications have the negative effect of disclosing records for which there is a strong policy of confidentiality. *See id.*

In *Devore*, on the other hand, we distinguished *McAdoo* and held that the government may question a reputation witness about *wrongful acts* committed by the defendant as a juvenile. In contrast to their probable lack of awareness of juvenile *adjudications*, "it seems reasonably likely ... that community members in general will have heard of a juvenile's commission of *wrongful acts*, independently of any arrest or adjudication." 530 A.2d at 1175 (emphasis added) (footnote omitted). Since wrongful acts were within the realm of community knowledge, we concluded, *McAdoo's* blanket prohibition against questions about juvenile adjudications should not apply to bar questions about the acts underlying those adjudications. *Id.* Our resolution of the issue at hand turns upon our response to a question left open by *Devore*: whether community members are likely to have heard of juvenile arrests, as they are of wrongful acts, independently of the resulting confidential adjudication. We answer that question in the affirmative.

An arrest is usually a public act. The community's knowledge of an arrest does not depend on its access to police records, *cf.* D.C.Code § 16–2333 (1981); to hearings, *cf.* D.C.Code § 16–2316(e) (1981); or to their consummation as a judicial decision, *cf.* D.C.Code § 16–2331 (1981). No knowledge obtained from juvenile records is involved. Rather, the fact of an arrest is knowledge accessible to any bystander who happens to view the arrest in progress.[4]

---

**3.** We note that appellant's records had not been sealed under D.C.Code § 16–2335 (1981).

**4.** The government's ability in general to question a reputation witness about the defendant's (non-juvenile) arrests is clear:

Arrest without more may nevertheless impair or cloud one's reputation. False arrest may do that. Even to be acquitted may damage one's good name if the community receives the verdict with a wink and chooses to remember defendant as one who ought to have been convicted....

The inquiry as to an arrest is permissible also because the prosecution has a right to

test the qualifications of the witness to bespeak the community opinion. If one never heard the speculations and rumors in which even one's friends indulge upon his arrest, the jury may doubt whether he is capable of giving any very reliable conclusions as to his reputation.

*Michelson, supra,* 335 U.S. at 482–83, 69 S.Ct. at 221–22. We held recently in *Crews v. United States,* 514 A.2d 432 (D.C.1986) that a defendant's arrests could be used to cross-examine a character witness he called to testify as to his truth and veracity.

What is known to the bystander soon becomes known to the community, and indeed, in the case of arrests, is likely to become a point of focus in the community's gaze.

We conclude that, when a defendant has chosen to place his character in issue by presenting a witness to testify about his reputation, fairness demands that the prosecution have the opportunity to challenge the witness' statements, both as to the depth of the witness' knowledge of events within the community's consciousness, and as to the accuracy of the witness' representations.[5] Having initiated inquiry into the view of his community, an inquiry the government could not itself make part of the trial, the defendant may not enshroud a history of arrests that are likely to have affected that community's view. As we stated in *Devore,* when a defendant "by introducing a character witness ... elects to prove his good name, he draws aside by his own hand whatever veil the law may otherwise place over his youthful conduct...." 530 A.2d at 1176.

Again, as we stressed in *Devore,* the trial court must "carefully weigh the probative value and prejudicial effect" of exposing the juvenile arrests before deciding whether to permit the prosecutor's inquiry. *See id.*[6] In the instant case, it is clear that the trial court considered the potential prejudice to appellant and concluded that any such prejudice was outweighed by the need to test the basis for the witness' testimony about appellant's reputation. We hold that the court did not abuse its discretion in permitting the impeachment.

In sum, we agree with appellant that the trial court abused its discretion when it excluded negative testimony about appellant's reputation; we hold, however, that the error was harmless. We also hold that the trial court properly exercised its discretion when it permitted the prosecutor to ask a reputation witness about appellant's juvenile arrests. Appellant's convictions are therefore

*Affirmed.*

NEWMAN, Associate Judge, dissenting:

Our jurisdiction, like most, has somewhat grudgingly accepted the evidentiary practices governing cross-examination of character witnesses testifying on behalf of a criminal defendant. This acceptance is attributable, it seems, more to inertia than anything else, for the practices at issue, though widely practiced, have been universally and severely criticized as "illogical", "irrational", "nonsensical", "archaic", "clumsy", even "grotesque". *See Michelson v. United States,* 335 U.S. 469, 486, 69 S.Ct. 213, 223, 93 L.Ed. 168 (1948); *Morris v. United States,* 469 A.2d 432, 435 (D.C. 1983); *Awkard v. United States,* 122 U.S. App.D.C. 165, 170, 352 F.2d 641, 646 (1965).

In *Michelson, supra,* the Supreme Court, even while accepting the prevailing practices, most eloquently depicted their irrationality. The Court noted the anomaly of disallowing a reputation witness from testi-

---

5. While cases dealing specifically with impeachment of a reputation witness by reference to the defendant's juvenile arrests appear to be few, those that we have found all allow such impeachment. *See Green v. State,* 352 So.2d 1149, 1151 (Ala.Crim.App.1977); *Love v. State,* 533 S.W.2d 6, 10 (Tex.Crim.App.1976); *State v. Knight,* 323 So.2d 765, 768 (La.1975); *Hendron v. Commonwealth,* 487 S.W.2d 275, 278 (Ky. 1972). *See also Commonwealth v. Jenkins,* 413 Pa. 606, 198 A.2d 497 (1964), in which the Pennsylvania Supreme Court reversed the defendant's conviction because of errors in cross-examining a reputation witness about the defendant's juvenile arrests. The court's basis for finding error, however, appears to have been the form of the prosecutor's question, rather than the fact that the arrests occurred when the defendant

was a juvenile. *See id.* at 607, 198 A.2d at 498. This interpretation is borne out by a more recent Pennsylvania decision, in which the court summarily rejected the appellant's argument that the trial court had erred in allowing impeachment of a reputation witness by reference to juvenile arrests. *See Commonwealth v. Floyd,* 494 Pa. 537, 550 n. 7, 431 A.2d 984, 992 n. 7 (1981).

6. In aid of its exercise of discretion, the court may choose to ascertain whether the arrest was accomplished out of public view or otherwise in such a way that the community probably was unaware of it. The defense, of course, may offer information to this effect in opposing such cross-examination.

fying as to his own knowledge and observation of the defendant, and constraining him to report only about hearsay he has gathered in the community, "although much of it may have been said by persons less qualified to judge than himself." *Id.* 335 U.S. at 477, 69 S.Ct. at 219; *see also Morris, supra,* 469 A.2d at 439 (Newman, J., dissenting). The defendant must pay for this "helpful but illogical" use of character witnesses to prove his good name, by being subjected to an "equally illogical" condition on their use: the prosecution may test the witness' credibility as a reporter for the community by asking if he has heard rumors of the defendant's former misconduct, arrests, or convictions, the very type of evidence of character or propensity which is closed to the prosecution in its case-in-chief. *Michelson, supra,* 335 U.S. at 478–79, 69 S.Ct. at 219–20. This "illogical" practice is notoriously subject to abuse.

> "[t]his method of inquiry or cross-examination is frequently resorted to by counsel for the very purpose of injuring by indirection a character which they are forbidden directly to attack in that way ... The value of the inquiry for testing purposes is often so small and the opportunities of its abuse by underhand ways are so great that the practice may amount to little more than a mere subterfuge....

*Id.* at 474 n. 4, 69 S.Ct. at 217 n. 4, quoting J. WIGMORE, EVIDENCES § 988 (3d ed. 1940).

Although recognizing that this practice "at its best opens a tricky line of inquiry as to a shapeless and elusive subject matter[, and a]t ·its worst ... opens a veritable Pandora's box of irresponsible gossip, innuendo and smear"[1] which, to make matters worse, the defendant has no opportunity to rebut, the majority of the Court went on to countenance the practice. Its reasoning:

> We concur in the general opinion of courts, textwriters and the profession that much of this law is archaic, paradoxical and full of compromises and compensations by which an irrational advantage to one side is offset by a poorly reasoned

counterprivilege to the other. But ... [t]o pull one misshapen stone out of the grotesque structure is more likely simply to upset its present balance between adverse interests than to establish a rational edifice.

*Id.* at 486, 69 S.Ct. at 223.

I have heretofore stated my opinion concerning *Michelson* that "the misshapen stone condemns the entire structure. It is long past time for us to build a new one." *Morris, supra,* 469 A.2d at 439 (Newman, J., dissenting). I renew my call now, perhaps even more fervently. It is bad enough to openly tolerate within the law a practice which the profession knows, and any observer can see, is highly prone to abuse and subterfuge. It is even worse when the subterfuge is used to put before the jury, under the guise of testing the character witness' credibility, otherwise inadmissible evidence of a defendant's prior juvenile record. I see no need to add to the ill-effects of this "condemned structure" that of subverting our well-established policy protecting the confidentiality of matters pertaining to juveniles.

That policy has long been reflected in our statutes and our case law. Confidentiality of juvenile case records is statutorily mandated, D.C.Code § 16–2331 (1981), and case records, social records, and law enforcement records relating to juvenile proceedings may be sealed two years after the final discharge of a juvenile from custody or supervision. D.C.Code § 16–2335(a). The general public is excluded from juvenile proceedings. D.C.Code § 16–23126(e). The enactment of these statutes

> is founded upon strong social policy, and their aim is amnesty and oblivion for the transgressions of youthful offenders. The fundamental philosophy of the juvenile court laws is that a delinquent child is to be considered and treated not as a criminal but as a person requiring care, education, and protection.... It would be a serious breach of public faith, therefore, to permit these informal and presumably beneficent procedures to become the basis for criminal records,

---

**1.** 335 U.S. at 480, 69 S.Ct. at 220.

which could be used to harass a person throughout his life.

*Thomas v. United States*, 74 U.S.App.D.C. 167, 170–71, 121 F.2d 905, 908 (1941).

The policy respecting confidentiality of juvenile records is likewise reflected in our law of evidence. Thus, evidence of a prior juvenile adjudication may not be used to impeach the general credibility of a witness. *Smith v. United States*, 392 A.2d 990, 993 (D.C.1978); *Brown v. United States*, 119 U.S.App.D.C. 203, 207–08, 338 F.2d 543, 547–48 (1964); *Thomas, supra,* 74 U.S.App.D.C. at 169–71, 121 F.2d at 907–09. And recently in *McAdoo v. United States*, 515 A.2d 412, 418 (D.C.1986), a case which, like the present one, concerned cross-examination of a defendant's character witness, we held that such a witness may not be impeached by being asked "if he has heard about" the defendant's prior juvenile convictions. The holding in *McAdoo* was based upon two considerations. One was a concern for our policy of protecting the confidentiality of juvenile matters. The other was that because of that policy, a reputation witness is unlikely to have heard about the defendant's prior juvenile adjudications. We concluded, therefore, that while the suggestion of a juvenile record will be highly prejudicial to defendant, the inquiry will have little probative value relative to the witness' credibility. *Id.* at 418–19.

Entranced by the logic of the latter consideration, and without even such as a nod to the former, the majority now decides that while the character witness cannot be questioned about the defendant's juvenile conviction, he may be questioned about the juvenile's arrest. The majority reasons that because a juvenile's arrest, unlike his conviction, is a public act of which the community will likely become apprised, knowledge of such an arrest is an appropriate test of a witness' claim to be a reporter of the community's view of defendant. Al-though the majority does mention that our decision in *McAdoo* was motivated in part by a concern for the confidentiality of the juvenile justice system, Maj.Op. at 932,[2] it then conveniently ignores this policy when it comes to discuss the basis for its decision. There, we hear only about the fact that questions about juvenile arrests are more probative of the witness' credibility than those about convictions. We hear nothing about the obvious fact that the prejudice inherent in such questions may likewise be greater, because not only do they divulge confidential information, they may also impugn the defendant's character by insinuating wrongdoing *when none may actually have taken place.*

"[T]he general public has a pronounced tendency to view even arrest by the police—let alone actual appearance in court— as conclusive evidence of guilt, irrespective of the result of an adjudication." Note, *Juvenile Delinquents: The Police, State Courts and Individualized Justice,* 79 HARV.L.REV. 775, 801 (1966). Thus, by the mere asking of the question, the prosecutor, "in spite of all theory and of the judge's charge," [3] succeeds in "telling the jury what it could not prove directly and what the [defendant] had no chance to deny, namely, that he had been so arrested; and thereby either insinuating that he had been convicted of the crime or leaving to the jury to guess that this had been the outcome." *Michelson, supra,* 335 U.S. at 495, 69 S.Ct. at 227 (Rutledge, J., dissenting). If it is a "breach of public faith" to allow a juvenile adjudication to be "used to harass a person throughout his life," *Thomas, supra,* 74 U.S.App.D.C. at 170–71, 121 F.2d at 908–09, how much more inequitable it is for that person to be harassed with a juvenile arrest which may not even have culminated in conviction.

The majority, like the division in *Devore,* is content to leave the weighing of prejudice against probity to the discretion of the

---

2. In so doing, the majority is more candid than the division in *Devore v. United States,* 530 A.2d 1173 (D.C.1987), upon which the majority relies. That case held that a defendant's reputation witness may be questioned about the wrongful acts underlying the defendant's juvenile conviction, even if she may not be asked about the conviction itself. In the position of having to distinguish *McAdoo,* the *Devore* division, incredibly, did not even acknowledge that *McAdoo* was motivated in part by a concern for confidentiality of the juvenile justice system. It glossed over that concern, describing *McAdoo* as being "primarily based" on the lack of probity

of questions regarding confidential juvenile convictions, and concluding that wrongful acts, being public, do not suffer from this problem. I regard this description of *McAdoo* as a distortion. The court in *McAdoo* plainly acknowledged our policy regarding confidentiality of the juvenile justice system, as well as the philosophy behind it. 515 A.2d at 418. These considerations played as much a part in its decision as did considerations of probity.

3. *Michelson, supra,* 335 U.S. at 474 n. 4, 69 S.Ct. at 217 n. 4, citing J. WIGMORE, *supra,* § 988.

trial court. Justice Rutledge, dissenting in *Michelson, supra,* expressed his concerns about this solution: "Nor is it enough, in my judgment, to trust to the sound discretion of trial judges to protect the defendant against excesses of the prosecution. To do this effectively they need standards. None are provided under the Court's ruling...." 335 U.S. at 494, 69 S.Ct. at 227. These doubts, which I share, are amplified in cases involving the disclosure of juvenile matters. In such cases, the prejudice of placing before the jury otherwise inadmissible propensity evidence is compounded by that of divulging conduct committed as a juvenile which the law, for reasons of sound policy, protects from public view. We have not seen fit to leave to the trial court's discretion the admissibility of juvenile records to impeach a witness' general credibility, *see Smith, supra,* 392 A.2d at 993, nor their use in impeaching a defendant's character witness. *See McAdoo, supra,* 515 A.2d at 418. I see no reasoned basis for a different rule when the issue is not juvenile adjudications, but the wrongful acts or arrests underlying them.

Of course, I recognize that the interest in confidentiality of juvenile proceedings is not absolute. *See Devore, supra,* 530 A.2d at 1175; *cf. Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). But it takes a strong countervailing interest to overcome it. The Supreme Court has ruled that the interest in protecting the confidentiality of juvenile records must give way to the defendant's Sixth Amendment Right to conduct effective cross-examination by showing a witness' bias. *Id.* But in *Smith, supra,* 392 A.2d at 991–93, we drew the line on the use of juvenile convictions to impeach, holding that while they may be used to show bias, they may not be used to impeach the witness' general credibility.

"In this as in all areas of the law, the legal principles supporting our decisions must be reasoned and consistent." *Towles v. United States,* 521 A.2d 651, 661 (D.C. 1987) (en banc) (Newman, J., dissenting). If the interest in confidentiality of juvenile proceedings is sufficient to outweigh a defendant's right to impeach the general credibility of a witness, it most certainly outweighs the prosecution's right to "test the credibility" of a defendant's reputation witness. *McAdoo, supra.* If the principles supporting confidentiality justify non-disclosure of juvenile *convictions* for such purposes, they must also justify non-disclosure of the wrongful act or arrest underlying the conviction. The decision in *Devore* and the majority's decision in this case let in through the back door what *McAdoo* forbids through the front, for reasons which are, in my view, specious. It is time for the en banc court to build a new structure.

Before PRYOR, Chief Judge, MACK, NEWMAN, FERREN, BELSON, TERRY, ROGERS, and STEADMAN, Associate Judges.

PER CURIAM.

### ORDER

On consideration of appellant's petition for rehearing en banc, and the opposition thereto; and it appearing that the majority of the judges of this court has voted to grant the petition for rehearing en banc, it is

ORDERED that appellant's petition for rehearing en banc is granted and that the opinion and judgment of December 9, 1987, are hereby vacated. It is

FURTHER ORDERED that the Clerk shall schedule this matter for argument before the court sitting en banc as soon as the business of the court permits. Counsel are hereby directed to provide ten copies of the briefs heretofore filed to the Clerk on or before March 21, 1988.